STATE OF NORTH CAROLINA v. REBECCA CASE DETTER

No. 2

(Filed 4 December 1979)

### 1. Constitutional Law § 30— list of State's witnesses—bill of particulars properly denied

The trial court did not err in denying defendant's motions for a bill of particulars since all of the information sought in defendant's first motion was contained in material which she received during pretrial discovery, and since her second motion was for a list of the State's witnesses which was information to which defendant was not entitled.

### 2. Constitutional Law § 30— statements by defendant to witnesses—pretrial discovery

The trial court erred in requiring the State to disclose to defendant before trial statements by witnesses containing remarks made to them by defendant, and since such error was favorable to defendant, she cannot complain that it was error for the trial judge to refuse to order disclosure by the State of the time and place where and to whom they were made; moreover, defendant's argument that nondisclosure of this information denied her her constitutional right to effective assistance of counsel was misplaced since (1) discovery issues that rise to the level of a constitutional issue are generally considered under the due process clause, and (2) when defendant is constitutionally entitled to disclosure of evidence favorable to him that is material to his guilt or punishment, such disclosures must be made only at trial, while the problem in this case involved pretrial discovery.

### 3. Criminal Law § 70; Constitutional Law § 43— conversation recorded during investigatory stage—no right to counsel

The trial court in a homicide prosecution did not err in admitting into evidence a tape recorded conversation between defendant and a witness where the conversation occurred during the investigatory stage of the case before arrest was made; no critical stage had been reached at the time the tape was made so that the Sixth Amendment right to counsel had not yet attached; and use of the tape at trial violated none of defendant's constitutional rights.

### 4. Criminal Law § 70; Constitutional Law § 43— defendant's appearance before district court judge—subsequent conversation recorded—no necessity for counsel

The trial court in a first degree murder case did not err in allowing into evidence a recorded statement by defendant to a witness which was made after defendant's initial appearance before a district court judge but before the probable cause hearing, indictment and arraignment, since defendant's initial appearance before the district court judge was not a critical stage of the proceedings, and the Sixth Amendment was therefore inapplicable because the right to counsel had not yet attached. G.S. 15A-601(a).

State v. Detter

### 5. Criminal Law § 70 — tape recordings — requirements for authentication

To insure proper authentication of a tape recording the State must show that the recorded testimony was legally obtained and otherwise competent; the mechanical device was capable of recording testimony and it was operating properly at the time the statement was recorded; the operator was competent and operated the machine properly; the identity of the recorded voices; the accuracy and authenticity of the recording; defendant's entire statement was recorded and no changes, additions or deletions have since been made; and custody and manner in which the recording has been preserved since it was made.

### 6. Criminal Law § 70 — tape recordings — authentication evidence sufficient

Tapes of conversations between defendant and witnesses were properly authenticated where the evidence tended to show that an officer showed the witness how to operate the machine and checked to see that it was operating properly; he was with the witness when the recording was made; the recorder was properly activated at the beginning of the conversation; they played the tape immediately after the conversation was recorded to check for accuracy; the officer had operated the machine many times in the past; the requisite holes had been knocked out on each side of the tape to prevent erasure; the officer had custody of the tape from the time it was made until trial; the witness identified the voices on the tape and testified that the tape contained the exact conversation she had with defendant; and basically similar testimony was given by the officer and another witness concerning the recorded conversation between defendant and that witness.

### 7. Criminal Law § 117.1 — prior consistent statements — jury instructions proper

The trial court properly instructed the jury to consider prior consistent statements only for the purpose of corroborating the witness's testimony at trial if the jury found that the prior statements did corroborate the trial testimony, but it was not prejudicial error for the court on other occasions to omit the words, "if you find that this statement does corroborate his/her testimony," nor was it error for the court on other occasions to fail to instruct with respect to prior consistent statements in the absence of request by defendant; furthermore, there was no merit to defendant's contention that the trial judge failed to charge the jury adequately on the nature and weight to be given the prior consistent statements used to corroborate the witness's testimony at trial.

### 8. Criminal Law § 113.1 — jury instructions — summary of testimony

The trial judge did not commit prejudicial error in instructing the jury that "you are to rely on your own recollection as to what a witness said or didn't say."

### 9. Criminal Law § 42.6 — body samples from deceased — chain of custody — test results admissible

In a prosecution of defendant for the first degree murder of her husband by poisoning, there was no merit to defendant's contention that results from tests performed on specimens from deceased's body were improperly introduced into evidence because a sufficient chain of custody was not established,

since the evidence tended to show that the pathologist who performed the autopsy on deceased removed specimens from the body, placed them in sealed containers which he then placed in mailing containers, and mailed them to the State Toxicology Laboratory; one of the laboratory personnel picked up the samples from the Post Office and took them to the laboratory; the samples were placed on a bench over which five or six persons had supervision; and the possibility that the specimens from deceased were interchanged with those from another body was too remote to require exclusion of the evidence.

**10. Homicide § 21.6— death by poisoning—sufficiency of evidence**

There was sufficient evidence of first degree murder by means of poisoning to take the case to the jury where it tended to show that, over a period of time, defendant sought ways to kill her husband and that an eyewitness saw her put arsenic poisoning in deceased's tea, food and ice cream in January, February and March of 1977 through use of Terro Ant Killer which contains a lethal dosage of arsenic; deceased died in June 1977; and in the opinion of medical experts he died of arsenic poisoning.

**11. Constitutional Law § 33: Homicide § 31.1— murder by poisoning—dates of murderous acts—ex post facto punishment—death penalty improperly imposed**

For purposes of the prohibition against *ex post facto* legislation, the dates of the murderous acts rather than the date of death is the date the murder was committed; therefore, where defendant administered poison to her husband on three occasions, all before 1 June 1977, at a time when the maximum punishment for first degree murder was life imprisonment, then imposition of the sentence of death under G.S. 15A-2002 violated the prohibition against imposition of an *ex post facto* punishment.

Justice BROCK did not participate in the consideration or decision of this case.

ON appeal by defendant from *Wood, J.,* 26 September 1978 Session of FORSYTH County Superior Court.

Defendant was charged in an indictment, proper in form, with first-degree murder in the death of her husband, Don Gene Detter. The primary evidence for the State was presented through the testimony of five lay witnesses and four doctors.

Joan Ladale Brooks, a friend and neighbor of the Detter family, visited the Detters in their home at 5301 Prince Charles Drive, Kernersville, in January, 1977. During the visit, defendant mentioned how cruel her husband was to the family and stated that she had had something done to the brakes of her husband's car "to either hurt him or harm him." In late January or early February, 1977, Brooks went with the defendant to the Crown Drug Store. There, the defendant gave Brooks some money and

asked her to purchase a bottle of Terro Ant Killer for her which Brooks did. Dr. McBay, Chief Toxicologist of North Carolina, testified that one bottle of Terro Ant Killer contains 300 milligrams of arsenic. A lethal dose of arsenic is between 100 milligrams and 300 milligrams.

During this same period of time, Brooks accompanied the defendant to the home of James Thomas Holly, Jr. During the visit the defendant asked Holly "what lead or lead poisoning would do to someone" and "where she could get some." Holly advised the defendant that lead "would most likely kill somebody." After returning home, Brooks observed the defendant go to a storage area, get some lead weights from a fishing tackle box, place them in a cooking pot half full of water, boil it down so that there was only a few drops of water left, and then observed the defendant pour the drops of water into a liquor bottle. Other evidence disclosed that the deceased was a heavy drinker and that he consumed three to four fifths of liquor per week.

Approximately one week later, Brooks observed the defendant pour the contents of a bottle of Terro Ant Killer into a glass of ice tea which defendant then gave to her husband which he drank. On her next visit to the Detter's house, Brooks heard the defendant remark that she "had asked her husband for a divorce and he wouldn't give her one . . . and she would be glad when everything was over and she wouldn't have to put up with Mr. Detter anymore."

In late March or early April, 1977, Brooks accompanied the defendant's son, Ted, to the Crown Drug Store, where he purchased two bottles of Terro Ant Killer which he then took home and gave to his mother. On several occasions in the latter half of March, 1977, Brooks observed the defendant place Terro Ant Killer in ice tea and give it to the deceased. On one occasion, Brooks observed the defendant pour Terro Ant Killer over a dish of ice cream and give the ice cream to the deceased.

In February, 1977, defendant and her son, Ted, visited Holly and defendant asked Holly if he "would be interested in killing her husband for Five Thousand Dollars." Holly declined the offer. On a later occasion Ted bought some "PCP" which is also known as "Angel Dust" from Holly. Two weeks later defendant accused Holly of "ripping her off." She stated that she put the drugs in

her husband's food but they "did nothing but make him happy." Defendant advised Holly that she wanted the drugs "to kill her husband." Holly also sold the defendant some cocaine and some "acid." Holly's wife testified that defendant asked Holly "how could she kill somebody with a needle and air?" Holly told the defendant that "an air bubble . . . in your vein . . . could kill you instantly." On a later occasion defendant told Holly that the drugs were not working and she did not understand why because she had placed the "PCP," cocaine and "acid" in her husband's food and in his liquor. Defendant stated that she was going to the Magic Market to meet someone "who could help her" and Holly did not see the defendant again.

In January, 1977, the defendant talked to Gregory Wayne Boyd and showed him a plastic bag which contained a pale brown powder. Defendant asked Boyd if he thought the powder would kill her husband. Defendant asked Boyd if he knew anybody who would kill her husband for five thousand dollars, and defendant offered to pay Boyd five thousand dollars if he would kill her husband.

In November or December, 1976, defendant met her hairdresser, Pamela Christy, at a restaurant in Kernersville for lunch. During lunch defendant asked Christy if she or her husband could "get some dope" for her; that she wanted the dope "to kill her husband." In January and February, 1977, defendant told Christy that she had put "some stuff" in her husband's food and he ate it but it didn't do anything to him.

The deceased was hospitalized from 30 March 1977 until 13 April 1977 and from 17 May 1977 until his death on 9 June 1977. During the first period of hospitalization, Dr. William Joseph Spencer tested deceased's urine for heavy metal poisoning and the results were negative. Dr. Spencer's diagnosis was that deceased was suffering from "peripheral neuropathy resulting from excessive alcohol intake." During the second period of hospitalization, Dr. Spencer noticed white lines across deceased's fingernails and he noticed a thickening of the skin over deceased's hands for which the medical term is hyperkeratosis, both symptoms of arsenic poisoning. A test for heavy metal poisoning was positive and deceased was treated with British Anti-Lewisite, a drug to combat arsenic poisoning. Dr. Spencer testified that

arsenic poisoning is also a cause of peripheral neuropathy and in his opinion, as an expert in internal medicine, deceased died as a result of arsenic poisoning.

Dr. James Alvis McCool performed the autopsy on deceased on the day of his death. Samples of hair, fingernails, bile, liver, blood, kidney, urine, stomach content and small bowel content were taken by Dr. McCool and mailed to Dr. Arthur J. McBay, Chief Toxicologist for the State of North Carolina. Test results at the State Laboratory showed that these specimens from deceased's body contained approximately ten times the normal amount of arsenic. In response to a hypothetical question, Dr. McBay stated that in his opinion deceased died of arsenic poisoning.

Defendant testified that neither she nor her son asked Brooks to purchase Terro Ant Killer or purchased any themselves. On one occasion, Brooks and her son did go to the drugstore to pick up a prescription for her. She never talked to Brooks about poisoning or wanting to kill her husband.

Defendant testified that she went to see Pamela Christy only to have her hair fixed; that she never stated to Christy that she wanted to kill her husband or wanted Christy or Christy's husband to buy drugs for her so that she could kill her husband; and that during her luncheon meeting with Christy at a restaurant they talked only about the defendant taking diet pills and not about her husband. Defendant denied that she ever purchased drugs from Holly or solicited him to murder her husband. She visited the Hollys in order to see their children and to attempt to get them to go to church. She also denied talking to Boyd about lead poisoning or about killing her husband and stated that she never tampered with the brakes on her husband's car or poisoned or drugged him in any way.

She stated that her husband was a very heavy drinker and that she was told by Dr. Spencer that her husband suffered from peripheral neuropathy because he drank so heavily. She was of the opinion that her husband somehow "received arsenic at the hospital" and that she "suspicioned he may have committed suicide." Alma Bailiff, a registered nurse, testified that she entered a notation in the hospital records on 22 May 1977 that she heard the deceased repeatedly say, "I did it and I'm sorry."

Several witnesses acquainted with the defendant testified that they had never heard her talk of wanting to or trying to kill her husband and that they had never seen her put any poisons in her husband's food. Also, several witnesses testified that the defendant had a good reputation in her community and in her church.

At the guilt-determination phase of the trial, the jury found the defendant guilty of first-degree murder. At the sentencing phase, the jury found that the murder committed by the defendant was especially heinous, atrocious, or cruel. As a mitigating circumstance, the State conceded and the jury found that the defendant had no significant history of prior criminal activity. The jury found that the mitigating circumstance was insufficient to outweigh the aggravating circumstance, and the jury found beyond a reasonable doubt that the aggravating circumstance was sufficiently substantial to call for imposition of the death penalty. The jury recommended the death sentence and pursuant to G.S. 15A-2002, the trial judge imposed that sentence. Defendant appealed to this Court.

Other facts relevant to the decision of this case will be related in the opinion.

*John J. Schramm, Jr. and David B. Hough for the defendant.*

*Attorney General Rufus L. Edmisten by Special Deputy Attorney General Isaac T. Avery III and Assistant Attorney General Joan H. Byers for the State.*

COPELAND, Justice.

Defendant has properly presented twenty-three assignments of error to this Court.

[1]   By her first assignment of error, defendant contends that the trial judge erred in denying her two motions for a bill of particulars pursuant to G.S. 15A-925.

G.S. 15A-925 provides in relevant part that:

"(b) A motion for a bill of particulars must request and specify items of factual information desired by the defendant which pertain to the charge and which are not recited in the

pleading, and must allege that the defendant cannot adequately prepare or conduct his defense without such information.

(c) If any or all of the items of information requested are necessary to enable the defendant adequately to prepare or conduct his defense, the court must order the State to file and serve a bill of particulars. Nothing contained in this section authorizes an order for a bill of particulars which requires the State to recite matters of evidence."

With respect to a motion for a bill of particulars, we have stated that under G.S. 15A-925:

"The function of such a bill of particulars is (1) to inform the defense of the specific occurrences intended to be investigated on the trial and (2) to limit the course of the evidence to the particular scope of inquiry. [Citations omitted.]

The granting or denial of motions for a bill of particulars is within the discretion of the court and is not subject to review except for palpable and gross abuse thereof." *State v. Swift*, 290 N.C. 383, 391, 226 S.E. 2d 652, 660 (1976), *quoting State v. McLaughlin*, 286 N.C. 597, 603, 213 S.E. 2d 238, 242 (1975), *death sentence vacated*, 428 U.S. 903 (1976).

In her first motion for a bill of particulars defendant sought disclosure of the date of her husband's death; the cause of death; the method and manner in which the State alleges the murder occurred; the identity of the murder weapon; the time and place of any overt acts of the defendant alleged to have resulted in her husband's death; the time, location and parties involved in the acts which were the proximate cause of his death; the source and brand name of any poisons administered to him; how such poison was administered; whether the poison was administered in one dose or several doses; and what particular doses the State alleges the defendant administered.

Defendant's contention that it was erroneous for the trial judge to deny this motion has no merit whatsoever. The record discloses that on 17 March 1978 the trial judge granted in part defendant's discovery motion and ordered the State to disclose the following: All statements, written or oral, made by defendant

to police officers and any other person; a transcript of recorded statements made by defendant; tangible physical evidence in the State's possession which it intended to introduce into evidence; results of all tests conducted on the deceased's body samples and on any other physical or tangible evidence the State intended to introduce into evidence; and the complete autopsy report. The order also required the State to make available to defendant, and any medical experts retained by her, the deceased's body samples for testing at the State Toxicology Laboratory. All the information requested by defendant in her first motion for a bill of particulars was contained in the above material that she received during pretrial discovery.

For example, the date and cause of death are listed in the autopsy report. The murder weapon (arsenic), the method and manner in which the killing occurred, the brand name and source of arsenic (Terro Ant Killer), the parties involved, and the fact that the arsenic was administered by defendant by placing it in his food and in his ice tea were all discussed in the tape recorded conversations defendant had with witness Brooks and witness Christy. Information on the levels of arsenic detected in the deceased's body samples are contained in the autopsy report and the laboratory test results. Defendant obtained this wealth of information during discovery and certainly she was fully aware of the "specific occurrences intended to be investigated on the trial." *State v. Swift, supra* at 391, 226 S.E. 2d at 660, *quoting State v. McLaughlin, supra* at 603, 213 S.E. 2d at 242. She had the information she needed to adequately prepare and conduct her defense as required by G.S. 15A-925. *See, State v. Porth*, 269 N.C. 329, 153 S.E. 2d 10 (1967), in which we held that since defendant was given copies of the autopsy report and other documents which adequately disclosed the basis of the State's case it was not error for the trial judge to deny the motion for a bill of particulars.

In defendant's second motion for a bill of particulars, she sought disclosure of a list of witnesses that the State intended to call at trial. Defendant is not entitled, under G.S. 15A-903 or any former statute or the common law, to a list of State's witnesses. *State v. Sledge*, 297 N.C. 227, 254 S.E. 2d 579 (1979); *State v. Abernathy*, 295 N.C. 147, 244 S.E. 2d 373 (1978); *State v. Carter*, 289 N.C. 35, 220 S.E. 2d 313 (1975), *death sentence vacated*, 428 U.S. 904 (1976); *State v. Spaulding*, 288 N.C. 397, 219 S.E. 2d 178

(1975), *death sentence vacated,* 428 U.S. 904 (1976). This assignment of error is overruled.

[2]    By her third assignment of error, defendant contends that the trial judge committed prejudicial error in limiting the discovery of the statements made by defendant. Witnesses Brooks, Holly, Christy and Boyd gave statements to Officer Grindstaff. The trial judge, presumably pursuant to G.S. 15A-903(a)(2), ordered that those witnesses' statements be disclosed to defendant to the extent they contained remarks made by defendant to those witnesses. Defendant obtained a list of remarks she had allegedly made to those witnesses concerning her desire to kill her husband but she did not obtain any information regarding the time of or place where the statements were made nor was there any indication as to whom each statement was allegedly made. Defendant contends that it was error to so limit this discovery of statements made by defendant.

G.S. 15A-903(a)(2) requires disclosure of "any oral statement made by the defendant which the State intends to offer in evidence at the trial." G.S. 15A-904(a) states that, "Except as provided in G.S. 15A-903(a), (b), (c) and (e), this Article does not require the production of . . . statements made by witnesses or prospective witnesses of the State to anyone acting on behalf of the State." This statute is an express restriction on pretrial discovery of witnesses' statements that a trial judge has no authority to exceed in his discovery order. *State v. Hardy,* 293 N.C. 105, 235 S.E. 2d 828 (1977).

Of course, if a witness' statement is discoverable under G.S. 15A-903(a), (b), (c) or (e), then it is discoverable under G.S. 15A-904 (a) due to the qualifying clause expressly contained in G.S. 15A-904(a). Here, the trial judge ordered that the State disclose to the defendant, "A written copy of any and all statements, written or oral, *made by the defendant to* investigating officers or *any other person or persons.*" Thus, the question presented is whether these witnesses' statements are discoverable under G.S. 15A-903 (a)(2), and thus are taken out of the express restriction on discovery of witnesses' statements contained in G.S. 15A-904(a) to the extent that the witnesses' statements contained remarks made to that witness by the defendant.

In a recent decision we addressed this very question and there held with respect to G.S. 15A-903(a)(2) that, "the intent of the Legislature was to restrict a defendant's discovery of his oral statements to those *made by him to persons acting on behalf of the State.*" *State v. Crews*, 296 N.C. 607, 620, 252 S.E. 2d 745, 754 (1979). (Emphasis added.) *See, State v. Stevens*, 295 N.C. 21, 243 S.E. 2d 771 (1978). Therefore, in the instant case, the able trial judge exceeded his authority to the extent that he ordered disclosure by the state of "any and all statements, written or oral, made by the defendant to . . . any other person or persons." We expressly interpreted G.S. 15A-903(a)(2) not to include discovery of such statements in *State v. Crews, supra.* Therefore, these witnesses' statements are expressly shielded from discovery by G.S. 15A-904(a). Finally, we note that G.S. 15A-904(a) shields these statements only from *pretrial* discovery. G.S. 15A-904(a) does not bar the discovery of prosecution witnesses' statements *at trial.* *State v. Hardy, supra.*

Here, the trial judge's error was in favor of the defendant. She certainly suffered no prejudice in having these statements disclosed to her during pretrial discovery. Since defendant was not entitled to have received them, she cannot now be heard to complain that it was error for the trial judge to refuse to order disclosure by the State of the time and place where and to whom they were made. Indeed, disclosure of the statements alone without this additional information is one of the factors that led us to the conclusion in *State v. Crews, supra* that disclosure of witnesses' statements (even to the extent they contain statements made by the defendant to the witness) is not required by G.S. 15A-903(a)(2).

" '[I]t would be illogical to assume the Act intended to require discovery of remarks of the defendant to bystander witnesses but not disclosure of the witnesses' names.' 45 N.C.A.G. 60 (1975) 'Where possible, the language of a statute will be interpreted so as to avoid an absurd consequence.' *State v. Hart*, 287 N.C. 76, 80, 213 S.E. 2d 291, 295 (1975). Furthermore, it is anomalous to think the Legislature granted a defendant indirect access to the names of the State's witnesses when it denied his right to this information directly." *State v. Crews, supra* at 620, 252 S.E. 2d at 754.

State v. Detter

Defendant claims that nondisclosure of this information denied her her constitutional right to effective assistance of counsel. Defendant's argument is misplaced for two reasons. First, discovery issues that rise to the level of a constitutional issue are generally considered under the due process clause. *See, e.g., State v. Hardy, supra; State v. Abernathy, supra; State v. Tatum*, 291 N.C. 73, 229 S.E. 2d 562 (1976); *United States v. Agurs*, 427 U.S. 97, 49 L.Ed. 2d 342, 96 S.Ct. 2392 (1976); *Moore v. Illinois*, 408 U.S. 786, 33 L.Ed. 2d 706, 92 S.Ct. 2562, *rehearing denied*, 409 U.S. 897 (1972); *Brady v. Maryland*, 373 U.S. 83, 10 L.Ed. 2d 215, 83 S.Ct. 1194 (1963). Second, it appears that when defendant is constitutionally entitled to disclosure of evidence favorable to him that is material to defendant's guilt or punishment, such disclosure must be made only *at trial, State v. Abernathy, supra*, and cases cited therein, and here, as noted above with respect to G.S. 15A-904(a), we are dealing with *pretrial* discovery. *State v. Hardy, supra.* This assignment of error is overruled.

By her fifth assignment or error, defendant contends that the trial judge erred in allowing witnesses Brooks and Boyd to testify concerning statements attributed to the defendant which were not disclosed to defendant prior to trial, in compliance with the trial judge's pretrial discovery order. For the reasons discussed above we have held that defendant was not entitled to receive disclosure of any of these statements prior to trial. Therefore, defendant cannot now be heard to complain that she received some of these statements but not others since she was not entitled to receive any of them under G.S. 15A-904(a).

Additionally we note that the testimony of Brooks that went beyond her pretrial statement was ordered stricken from the record, and the jury was instructed to disregard it and that the portion of Boyd's testimony that defendant objected to at trial was not contained in his pretrial statement so the district attorney was not in a position to disclose it before trial. Even if there had been a violation of the pretrial discovery order in this case, defendant's remedy is not necessarily a new trial. Her remedy would be to pursue the sanctions set forth in G.S. 15A-910. *State v. Jones*, 295 N.C. 345, 245 S.E. 2d 711 (1978). Imposition of the sanctions of that statute is within the discretion of

the trial judge. *State v. Jones, supra; State v. Stevens, supra.* This assignment of error is overruled.

By her seventh and eighth assignments of error, defendant contends that the trial judge erred in admitting into evidence the tape recorded conversations between defendant and witness Brooks and between defendant and witness Christy and playing the recordings in the presence of the jury. Defendant contends that the tape recordings were not properly authenticated and that the manner in which they were obtained violated defendant's constitutional right to counsel. These assignments of error are without merit.

G.S. 15A-975(a) provides that, "[i]n superior court, the defendant may move to suppress evidence *only prior to trial* unless the defendant did not have reasonable opportunity to make the motion before trial or unless a motion to suppress is allowed during trial under subsection (b) or (c)." (Emphasis added.) When no exception to making the motion to suppress before trial applies, failure to make the pretrial motion to suppress waives any right to contest the admissibility of the evidence at trial on constitutional grounds. *State v. Hill*, 294 N.C. 320, 240 S.E. 2d 794 (1978). *See also, Wainwright v. Sykes*, 433 U.S. 72, 53 L.Ed. 2d 594, 97 S.Ct. 2497, *rehearing denied*, 434 U.S. 880 (1977), in which the United States Supreme Court held that it is not impermissible for a state to impose reasonable conditions on the assertion of motions to suppress evidence.

The exceptions to making the motion to suppress evidence prior to trial appear in subsections (b) and (c) of G.S. 15A-975. More specifically, G.S. 15A-975(b)(1) allows the motion to suppress to be made for the first time at trial if the State has failed to give notice sooner than 20 working days before trial of its intention to use as evidence a statement made by the defendant. As of 19 February 1978 defendant had received no such notice of the State's intention to use the tape recordings at trial. On that date, defendant filed a pretrial motion to suppress "the introduction into evidence of any oral or recorded statements of the defendant within the possession or control of the State of which copies or the contents of such statements have not been divulged to the defendant." Defense counsel stated in the motion that he was "unable to particularize further the grounds for this motion"

because it was not known what evidence the State had or intended to use at trial. Defendant moved that,

> "[T]he State be required to inform the defendant, Rebecca Case Detter, of the specific evidence it intends to introduce so that appropriate motions to suppress this evidence, if any evidence does in fact exist, may be made within the requirements of the criminal procedure act of North Carolina.
>
> WHEREFORE the defendant requests a pretrial hearing to determine the admissibility into evidence of any evidence as is set out in the above paragraphs. Defendant requests that Court exclude from evidence at trial any evidence that the State does not give the defendant timely motion of notice to introduce. Defendant requests that she be allowed to supplement this motion at such time as she is provided with discovery as provided by N.C.G.S. 15A-900 *et seq.* and with proper notice of intention to introduce evidence at trial by the State."

The pretrial hearing requested by defendant was held at the 27 February 1978 Criminal Session of Forsyth County Superior Court. At the conclusion of this hearing, McConnell, J. advised that he would not rule on motions directed toward the suppression of evidence because he felt that the judge who ultimately tried the case should have an opportunity to rule on such motions.

At the pretrial hearing, defendant was also heard on her 10 February 1978 motion to compel discovery. The discovery order entered by McConnell, J. on 17 March 1978 included the requirement that the State disclose to defendant the "transcript of any recorded statements made by the defendant." The correctness of this portion of the discovery order, presumably made pursuant to G.S. 15A-903(a)(1), ordering disclosure of *recorded* statements made by defendant *to witnesses*, is questionable due to our holding above and our holding in *State v. Crews, supra* that G.S. 15A-903(a)(2) (disclosure of *oral* statements made by defendant) permits disclosure only of statements made by defendant *to police officers.* Statements made by defendant *to witnesses* are shielded from discovery by G.S. 15A-904(a) even when those statements contain remarks made by defendant to those witnesses. *See also, State v. Hardy, supra.* G.S. 15A-975(b)(1) does not even *require* that the State give notice before trial of its in-

tention to use statements made by the defendant at trial. That statute merely states that *if* such notice of intention is not given sooner than twenty working days prior to trial, then defendant may make his motion to suppress those statements for the first time at trial.

Although the discovery order appears to be erroneous in ordering disclosure of the recorded statements, the fact remains that pursuant to that order defendant received more than notice of the State's intention to use the recorded statements at trial; the transcripts of those statements were actually disclosed to defendant before trial. Therefore, while defendant was in no position to make a pretrial motion to suppress the recorded statements on constitutional grounds on 19 February 1978 (and had to move to be allowed to supplement that motion to suppress at a later date), defendant was in a position to make a pretrial motion to suppress at all times after the State complied with the discovery order in this case which was sooner than twenty working days prior to trial. Thus the exception to making the pretrial motion to suppress contained in G.S. 15A-975(b)(1) does not apply. Defendant never made a pretrial motion to suppress the recorded statements *on constitutional grounds* although she had reasonable opportunity to do so and the exceptions set forth in subsections (b) and (c) of G.S. 15A-975 do not apply. It appears that defendant has waived any right to contest the admissibility of these recorded statements at trial on constitutional grounds. *State v. Hill, supra; see, Wainwright v. Sykes, supra.*

It is an established principle of appellate review that this Court will refrain from deciding constitutional questions when there is an alternative ground available upon which the case may properly be decided. *State v. Goodman,* 298 N.C. 1, 257 S.E. 2d 569 (1979); *State v. Jones,* 296 N.C. 495, 251 S.E. 2d 425 (1979); *State v. Crabtree,* 286 N.C. 541, 212 S.E. 2d 103 (1975).

However, we cannot ignore the fact that McConnell, J. stated at the pretrial hearing that he would not rule on any pretrial motions to suppress. Also, the following statement appears of record in this case, "Judge Wood [the judge who tried this case], in his discretion, elected to rule on the admissibility of evidence at such time as the same was introduced during the course of the trial." The date on which this statement was made does not appear in

the record. The record in this regard, as in many other instances in this case, was poorly prepared requiring an inordinate investment of the Court's time to discern what happened and when, in order to decide this case. A great deal more care should have been exercised in preparing this record on appeal. We also note in passing that it is the better practice for the appellee's brief to use the same numbering system for the questions presented as the appellant's brief. The State's failure to do so has further complicated our review in this case. *See, State v. Siler,* 292 N.C. 543, 234 S.E. 2d 733 (1977).

Defendant requested in her pretrial motion to suppress that she be allowed to supplement that motion once she determined what evidence the State possessed and intended to use at trial. However, no further motions to suppress on constitutional grounds were ever filed due either to neglect or to reliance on the statements of McConnell, J. and Wood, J. that any motions to suppress evidence would be considered only at trial. At trial, defendant's motions to suppress these recorded statements were not overruled because they were not timely made; instead, they were considered and overruled on their merits. In fairness to the defendant under the peculiar facts of this case, we believe it to be necessary to reach the constitutional question on this issue.

Defendant maintains that introducing the recorded conversations into evidence violated her Sixth Amendment right to counsel under the decisions in *Brewer v. Williams,* 430 U.S. 387, 51 L.Ed. 2d 424, 97 S.Ct. 1232, *rehearing denied,* 431 U.S. 925 (1977) and *Massiah v. United States,* 377 U.S. 201, 12 L.Ed. 2d 246, 84 S.Ct. 1199 (1964). This contention is without merit.

The Sixth Amendment right to counsel has been made applicable to the states through the Fourteenth Amendment. *Gideon v. Wainwright,* 372 U.S. 335, 9 L.Ed. 2d 799, 83 S.Ct. 792 (1963). No person may be imprisoned for any offense, absent a knowing and intelligent waiver, unless he was represented by counsel at his trial. G.S. 7A-451(a)(1); *Argersinger v. Hamlin,* 407 U.S. 25, 32 L.Ed. 2d 530, 92 S.Ct. 2006 (1972). The right to counsel applies at the taking of a guilty plea. *Id.* Also, the right to counsel attaches and applies not only at trial but also at and after any pretrial proceeding that is determined to constitute a critical stage in the proceedings against the defendant. *Brewer v.*

*Williams, supra; Hamilton v. Alabama,* 368 U.S. 52, 7 L.Ed. 2d 114, 82 S.Ct. 157 (1961); *Powell v. Alabama,* 287 U.S. 45, 77 L.Ed. 158, 53 S.Ct. 55 (1932).

Whether a critical stage has been reached depends upon an analysis of "whether potential substantial prejudice to defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice." *United States v. Wade,* 388 U.S. 218, 227, 18 L.Ed. 2d 1149, 1157, 87 S.Ct. 1926, 1932 (1967). A critical stage has been reached when constitutional rights can be waived, defenses lost, a plea taken or other events occur that can affect the entire trial. *Hamilton v. Alabama, supra.* A preliminary hearing, though not in itself constitutionally required, is, when given, a critical stage requiring the assistance of counsel or a valid waiver of that right. *Coleman v. Alabama,* 399 U.S. 1, 26 L.Ed. 2d 387, 90 S.Ct. 1999 (1970). A pretrial post-indictment lineup is a critical stage requiring the presence and assistance of counsel. *United States v. Wade, supra.* The United States Supreme court also addressed the issue of what constitutes a critical stage before trial in *Escobedo v. Illinois,* 378 U.S. 478, 12 L.Ed. 2d 977, 84 S.Ct. 1758 (1964), and there held that,

> "[W]here . . . the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment' . . . ." *Id.* at 490-91, 12 L.Ed. 2d at 986, 84 S.Ct. at 1765.

In *Miranda v. Arizona,* 384 U.S. 436, 16 L.Ed. 2d 694, 86 S.Ct. 1602, *rehearing denied sub nom.,* 385 U.S. 890 (1966), the United States Supreme Court stated that an in-custody police interrogation is inherently intimidating. Decision in *Miranda* was placed on the Fifth rather than the Sixth Amendment but, in order to secure defendant's constitutional right against compulsory self-incrimination, which has been made obligatory on the states by

the Fourteenth Amendment, *Malloy v. Hogan*, 378 U.S. 1, 12 L.Ed. 2d 653, 84 S.Ct. 1489 (1964), the police must specifically inform defendant that he has the right to have an attorney, to have one appointed for him if he cannot afford one, and to have the attorney present during questioning. *Miranda v. Arizona, supra.* Since the approach in *Miranda* to the issue of securing a defendant's constitutional rights during an in-custody police interrogation was based on the Fifth Amendment, the decision in *Escobedo*, which approached the same issue on the basis of a critical stage analysis under the Sixth Amendment, has been limited to its specific facts. *Kirby v. Illinois*, 406 U.S. 682, 32 L.Ed. 2d 411, 92 S.Ct. 1877 (1972); *Johnson v. New Jersey*, 384 U.S. 719, 16 L.Ed. 2d 882, 86 S.Ct. 1772, *rehearing denied sub nom.*, 385 U.S. 890 (1966). Also, the United States Supreme Court has, "in retrospect perceived that the 'prime purpose' of *Escobedo* was not to vindicate the constitutional right to counsel as such, but, like *Miranda*, 'to guarantee full effectuation of the privilege against self-incrimination . . . .' " *Kirby v. Illinois, supra* at 689, 32 L.Ed. 2d at 417, 92 S.Ct. at 1882, *quoting Johnson v. New Jersey, supra* at 729, 16 L.Ed. 2d at 890, 86 S.Ct. at 1779. Therefore, with the exception of *Escobedo*, the Sixth Amendment right to counsel has in "*all* . . . cases . . . involved points of time at or after the initiation of adversary judicial criminal proceedings — whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illinois, supra* at 689, 32 L.Ed. 2d at 417, 92 S.Ct. at 1882; *Brewer v. Williams, supra; Massiah v. United States, supra; cf., Pointer v. Texas*, 380 U.S. 400, 13 L.Ed. 2d 923, 85 S.Ct. 1065 (1965); *see also*, 21 Am. Jur. 2d *Criminal Law* § 313 (Supp. 1979) and cases cited therein; Annot., 5 A.L.R. 3d 1269 (1966) and cases cited therein.

Once a critical stage has been reached, such as an arraignment in *Brewer v. Williams, supra*, the police may not question a defendant, absent a valid waiver, without the presence and assistance of counsel, *id.*, and the police may not do indirectly through an informer that which they cannot do themselves. That is, once a critical stage has been reached, such as an indictment in *Massiah v. United States, supra*, the police may not use an informer, absent a valid waiver, to conduct a secret interrogation in the absence of counsel. *Id.* The investigation may continue after a critical stage has been reached, but the defendant's own in-

criminating statements so obtained through use of an informer may not be used against him at his trial. *Id.*

However, if no critical stage has yet been reached then the Sixth Amendment is inapplicable because the right to counsel has not yet attached. During this period of time, when the police are in the investigatory stage (unless the police bring the defendant in for an in-custody interrogation which would require that the *Miranda* warnings be given which, of course, includes, under the Fifth Amendment, the right to have counsel present during questioning), the decisions turn on application of the Fourth and Fifth Amendments rather than the Sixth Amendment unless the case presents exactly the same fact situation as *Escobedo*. In order to invade a defendant's reasonable expectation of privacy to conduct a search under the Fourth Amendment for oral statements by using an electronic eavesdropping device, the police must have probable cause and comply with the requirements in *Katz v. United States*, 389 U.S. 347, 19 L.Ed. 2d 576, 88 S.Ct. 507 (1967), and the Fourth Amendment has been made obligatory on the states through the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 6 L.Ed. 2d 1081, 81 S.Ct. 1684 (1961). However, if the police use an informer to overhear defendant's statements there is no Fourth Amendment violation because no surreptitious search for oral statements has been conducted; instead, the defendant has talked freely and voluntarily to someone in whom he has simply misplaced his confidence. *Hoffa v. United States*, 385 U.S. 293, 17 L.Ed. 2d 374, 87 S.Ct. 408 (1966), *rehearing denied*, 386 U.S. 940 (1967). The use of informers has been approved from time immemorial and defendant takes the risk that the person to whom he is talking is a police informer whether by the informer's voluntary action or at the instigation of the police. *Id.* The risk is not increased when the informer is also wired for sound so that the defendant's statements have been recorded or simultaneously transmitted to police and there is still no Fourth Amendment violation. *United States v. White*, 401 U.S. 745, 28 L.Ed. 2d 453, 91 S.Ct. 1122 (1971) (*Katz* specifically distinguished), *rehearing denied*, 402 U.S. 990 (1971).

The same is true under Fifth Amendment analysis. When no critical stage has been reached triggering application of the Sixth Amendment (and the police are not themselves conducting an in-custody interrogation directly within the fact situation of *Escobedo*), then the case is analyzed under the Fifth Amendment.

The police may not interrogate the defendant themselves without giving defendant his *Miranda* warnings (including the right to counsel), *Miranda v. Arizona, supra*, but the police may use an informer and there has been no violation of the Fifth Amendment in such a situation because the defendant was under no compulsion to speak. *Hoffa v. United States, supra*. When the police conduct the interrogation, the situation is inherently coercive and intimidating, *Miranda v. Arizona, supra*, but there is no such compulsion to speak when an informer is used. *Hoffa v. United States, supra*. (*Miranda* specifically distinguished.) Instead, defendant has talked freely and voluntarily to someone in whom he has misplaced his confidence. Defendant takes the risk that the person in whom he voluntarily confides is a police informer and there is no Fifth Amendment violation. *Id.*

. Here, the defendant was arrested on 22 November 1977, and she was released on bail on that date. She had her initial appearance before a district court judge (there was no initial appearance before a magistrate) on 23 November 1977. Her probable cause hearing was held on 12 January 1978. She was indicted at the 30 January 1978 session of the grand jury and was arraigned on 27 February 1978. The tape recorded conversation between defendant and Christy occurred on 15 September 1977 and the tape recorded conversation between defendant and Brooks occurred on 11 January 1978.

[3] The conversation between defendant and Christy clearly occurred during the investigatory stage of this case before the arrest was even made. Therefore, use of this tape at defendant's trial is controlled by the decisions in *Hoffa* and *White* as opposed to *Brewer* and *Massiah* as discussed at length above. No critical stage had been reached at the time this tape was made so the Sixth Amendment right to counsel had not yet attached and there were no Fourth or Fifth Amendment violations. The police did not themselves conduct an in-custody interrogation so *Escobedo* and *Miranda* are inapplicable. Use of this tape at trial violated none of defendant's constitutional rights. *Hoffa v. United States, supra*; *United States v. White, supra*.

[4] The conversation between defendant and Brooks occurred after defendant had been arrested and released on bail and after defendant's initial appearance before a district court judge but

before the probable cause hearing, indictment and arraignment. Therefore, the question presented at this point is whether the initial appearance before a district court judge is a critical stage triggering application of the Sixth Amendment. If it is, then use of this tape at defendant's trial violated her Sixth Amendment right to counsel under *Massiah;* if it is not, then the right to counsel had not yet attached and use of the tape at trial violated none of defendant's constitutional rights according to the decisions in *Hoffa* and *White*.

We held in *State v. Hairston,* 280 N.C. 220, 185 S.E. 2d 633, *cert. denied sub nom.,* 409 U.S. 888 (1972), that G.S. 7A-451(b)(4) provides and the Sixth Amendment requires that defendant be informed of his right to counsel at a *preliminary hearing* and that he be provided with counsel if he is indigent unless he validly waives this right. Under our Criminal Procedure Act of 1975, Chapter 15A, effective 1 July 1975, the preliminary hearing has been divided into two parts. The Official Commentary to Article 30 of Chapter 15A states that, "This code has *two preliminary hearings* before a judge in district court: *the first appearance before a district court judge and the probable-cause hearing.*" (Emphasis added.) Since the effective date of the Criminal Procedure Act of 1975 we have held that the *probable cause hearing* is a critical stage triggering application of the Sixth Amendment right to counsel. *State v. Cobb,* 295 N.C. 1, 243 S.E. 2d 759 (1978).

The question here is whether the reference in G.S. 7A-451(b)(4) to a *prelimintary hearing* means that a defendant has a Sixth Amendment right to counsel at the *initial appearance before the district court judge.* We have specific statutory language on this question. G.S. 15A-601(a) provides, "This first appearance before a district court judge is not a critical stage of the proceedings against the defendant."

It is apparent from the relevant case law that the initial appearance before a district court judge is not a critical stage because it is not an adversarial judicial proceeding where rights and defenses are preserved or lost or a plea taken. *White v. Maryland,* 373 U.S. 59, 10 L.Ed. 2d 193, 83 S.Ct. 1050 (1963) *(per curiam); Hamilton v. Alabama, supra; Kirby v. Illinois, supra.* The relevant functions of the district court judge at the initial appearance are to determine the sufficiency of the charges, G.S.

---

---

15A-604; to inform the defendant of the charges against him and to furnish him a copy of same, G.S. 15A-605(1) and G.S. 15A-605(2); to assure defendant's right to counsel for the next stages of the proceedings, G.S. 15A-603; to obtain either a demand for or waiver of the probable cause hearing, G.S. 15A-606; and to determine or review the defendant's eligibility for release on bail, G.S. 15A-605(3).

The sufficiency of the charges, G.S. 15A-604, is not determined in an adversarial setting through the introduction of evidence with examination and cross-examination of witnesses. Instead, that statute simply recognizes that much time and trouble can be saved if the district court judge has the authority at the initial appearance to dispose of cases where it is obvious from the relevant process papers that they are insufficient on their face to adequately bring a charge against the defendant. *See*, Official Commentary to G.S. 15A-604. The taking of testimony in an adversarial judicial setting is reserved for the probable cause hearing. Waiver of the right to counsel, G.S. 15A-603, and waiver of the probable cause hearing which is a statutory right, G.S. 15A-606, and not a constitutional right, *State v. Hairston, surpa,* do not require the assistance of counsel. *See, e.g., Johnston v. Zerbst,* 304 U.S. 458, 82 L.Ed. 1461, 58 S.Ct. 1019 (1938) (waiver of constitutional right to counsel); *Miranda v. Arizona, supra* (waiver of defendant's constitutional rights under *Miranda*). Furthermore, at the initial appearance, defendants are informed of their right against self-incrimination. G.S. 15A-602. Thus, it is apparent that the purpose of the initial appearance is to aid and prepare the defendant *for the further proceedings* which will be adversarial in nature principally by informing him of his constitutional rights and informing him of the charges against him. G.S. 15A-605.

The initial appearance before a district court judge is not a trial-like confrontation requiring the guiding hand of counsel to help the defendant meet his adversary. *See, United States v. Ash,* 413 U.S. 300, 37 L.Ed. 2d 619, 93 S.Ct. 2568 (1973) (a post-indictment photographic display is not a critical stage). The constitutional right that is applicable at this point that we must insure is afforded the defendant is the right to remain silent and the judge at the initial appearance has the duty to inform defendant of this right. G.S. 15A-602.

Thus, use of the Brooks' tape at defendant's trial violated none of her constitutional rights. No critical stage had yet been reached triggering application of the Sixth Amendment; the police did not themselves conduct an in-custody interrogation so *Escobedo* and *Miranda* do not apply; and there were no Fourth or Fifth Amendment violations. *Hoffa v. United States, supra; United States v. White, supra.*

Additionally, we note that G.S. 7A-451(b)(3) (Cum. Supp. 1977) provides that "[a] hearing for the *reduction* of bail, or to fix bail *if bail has been earlier denied*" (emphasis added) is a critical stage requiring the assistance of counsel. We need not deal with this subsection of the statute because it does not apply in this case. Defendant was released on bail on the day she was arrested. There was no bail *reduction* hearing or a bail hearing *after bail had earlier been denied.*

Also, defendant employed counsel early after her arrest and before 11 January 1978. In this situation, the constitutional issue concerns the use of an informer to directly invade confidential communications between a defendant and his attorney. *See, Weatherford v. Bursey,* 429 U.S. 545, 51 L.Ed. 2d 30, 97 S.Ct. 837 (1977) and *Hoffa v. United States, supra; see also,* Annot., 5 A.L.R. 3d 1360 (1966) and cases cited therein dealing with the restrictions on and limitations on the interference of the right to communicate with counsel *assuming* that the constitutional right to counsel has attached. There was no direct invasion of any confidential communications between defendant and her counsel in this case.

In any event, use of the Brooks' tape as substantive evidence of defendant's guilt was harmless beyond a reasonable doubt. G.S. 15A-1443(b); *see, State v. Shutt,* 279 N.C. 689, 185 S.E. 2d 206 (1971), *cert. denied,* 406 U.S. 928 (1972); *Chapman v. California,* 386 U.S. 18, 17 L.Ed. 2d 705, 87 S.Ct. 824, *rehearing denied,* 386 U.S. 987 (1967); *Moore v. Illinois, supra* and *Coleman v. Alabama, supra* (the last two cases remanded by the United States Supreme Court for determination as to whether absence of counsel at the preliminary hearing was harmless error).

Here, defendant's statements during her conversation with Brooks were in no manner incriminatory. During the conversation, she emphatically denied any and all connection with her hus-

band's death. As such, those statements corroborated her testimony at trial that she had nothing to do with her husband's death. Indeed, defendant was the first to bring out the contents of this tape during the cross-examination of Brooks. The trial judge then decided that the jury could get a more accurate picture of this conversation between defendant and Brooks if the tape was played to the jury. Defendant objected but her objection was overruled. Defendant's statements on the tape were considered by the jury as substantive evidence of her guilt. We are convinced beyond a reasonable doubt that there is no reasonable possibility that defendant's statements on the Brooks' tape contributed to her conviction. *Chapman v. California, supra.*

Also, Brooks' statements on the same tape were, under the trial judge's specific instructions, considered by the jury only to the extent they corroborated Brooks' testimony at trial. This certainly was proper. *State v. Medley,* 295 N.C. 75, 243 S.E. 2d 374 (1978); *State v. Hopper,* 292 N.C. 580, 234 S.E. 2d 580 (1977); 1 Stansbury's N.C. Evid. § 51 (Brandis rev. 1973) and cases cited therein.

[5] Tape recorded evidence must be properly authenticated before it can be introduced into evidence and defendant contends that there is insufficient evidence in the record to support the trial judge's findings that the two recordings were properly authenticated as required by *State v. Lynch,* 279 N.C. 1, 181 S.E. 2d 561 (1971).

In *State v. Godwin,* 267 N.C. 216, 147 S.E. 2d 890 (1966), Justice Pless, speaking for the Court, held that tape recordings of telephone conversations between defendant and a prosecuting witness are properly authenticated when the prosecuting witness identifies the voices on the tapes and states that the tapes are a fair and accurate representation of the conversations. In *State v. Lynch, supra,* Justice Sharp (later Chief Justice), speaking for the Court, held that to lay a proper foundation for the admission of a defendant's recorded confession or incriminating statement made to police officers, the State must show:

"(1) that the recorded testimony was legally obtained and otherwise competent; (2) that the mechanical device was capable of recording testimony and that it was operating properly at the time the statement was recorded; (3) that the

operator was competent and operated the machine properly; (4) the identity of the recorded voices; (5) the accuracy and authenticity of the recording; (6) that defendant's entire statement was recorded and no changes, additions, or deletions have since been made; and (7) the custody and manner in which the recording has been preserved since it was made. *Id.* at 17, 181 S.E. 2d at 571. (Citations omitted.)

The State urges us in its brief to hold that *Godwin* applies when a conversation between defendant and a *witness* is recorded and that *Lynch* applies when a conversation, confession or interrogation between defendant and a *police officer* or government agent is recorded. There are differences in the two circumstances because, for a confession to be admissible, the *Miranda* warnings must be given, a valid waiver obtained and the confession must be voluntary. However, there is no difference between the two situations as far as the authenticity of the recording is concerned. Whenever a recorded statement is introduced into evidence the seven steps set forth in *Lynch* should be followed to insure proper authentication of that recording. 29 Am. Jur. 2d *Evidence* § 436 (1967); Annot., 58 A.L.R. 2d 1024, § 4 (1958) and cases cited therein. It is apparent, from a close reading of both *Godwin* and *Lynch,* that the seven steps enumerated in *Lynch* are but a further breakdown and more precise statement of the requirements for authentication that are subsumed within the second requirement in *Godwin* that the recording be a "fair and accurate representation of the conversations." *State v. Godwin, supra* at 218, 147 S.E. 2d at 891.

[6] Here, the trial judge conducted a *voir dire* with respect to each tape recorded conversation and made findings of fact that complied with all of the requirements set forth in *Lynch.* Defendant contends that there is insufficient evidence in the record to support the trial judge's findings. However, upon careful scrutiny of the record, we find that there is sufficient evidence to support his findings.

With respect to the recorded conversation between defendant and Brooks, Officer Grindstaff testified that he held a meeting with Brooks beforehand to show her how to operate the tape recording machine and to check whether the machine was operating properly; that he was with Brooks when the recording

was made; that the recorder was properly activated at the beginning of the conversation; that they played the tape immediately after the conversation was recorded to check for accuracy; that he has operated the machine many times in the past; that the requisite holes had been knocked out on each side of the tape to prevent erasure; and that he had custody of the tape from the time it was made until trial. Brooks identified the voices on the tape and testified that the tape contains the exact conversation she had with the defendant and that nothing has been added to it. Upon close scrutiny of the record, we find that sufficiently similar testimony was given by Officer Grindstaff and witness Christy as to the recorded conversation between defendant and Christy. Clearly, there is abundant evidence in the record to support the trial judge's findings and the findings of fact meet all of the requirements of *Lynch* with respect to both recorded conversations. Therefore, the tapes of both conversations were properly authenticated before being introduced into evidence.

Defendant also maintains with respect to the Brooks' tape that the voices on the tape were distorted because the cold weather affected the making of the tape by causing the batteries to lose power. There is no evidence on the record that any portion of the tape was inaudible on *voir dire* or when played to the jury. Even if a portion had been inaudible it would still be admissible. *Searcy v. Justice,* 20 N.C. App. 559, 202 S.E. 2d 314 (1974) and cases cited therein; 29 Am. Jur. 2d, *Evidence* § 436 (1967) and cases cited therein. These assignments of error are overruled.

[7] By her ninth, tenth, eleventh and twelfth assignments of error, defendant contends that the trial judge failed to give correct instructions on the admissibility of prior consistent statements of witnesses for purposes of corroboration only. These assignments are without merit.

On several occasions, the trial judge instructed the jury to consider prior consistent statements only for the purpose of corroborating the witness' testimony at trial if the jury found that the prior statements did corroborate the trial testimony. This instruction was proper. *State v. Medley, supra; State v. Hopper, supra.*

On other occasions when the instruction was given, the latter part of the instruction, to-wit, "if you find that this statement does corroborate his/her testimony," was omitted. This instruction, while not as complete as it should have been, does not amount to prejudicial error because it is always a question for the jury to determine whether or not the prior consistent statement does in fact corroborate the witness' testimony at trial. *State v. Case*, 253 N.C. 130, 116 S.E. 2d 429 (1960), *cert. denied*, 365 U.S. 830 (1961).

When the prior consistent statements of Boyd were introduced the trial judge instructed the jury only with respect to prior inconsistent statements and not prior consistent statements. At this point, defense counsel did not request a limiting instruction with regard to prior consistent statements. When the limiting instruction is not requested, it is not error if it is not given. *State v. Bryant*, 282 N.C. 92, 191 S.E. 2d 745 (1972), *cert. denied sub nom.*, 410 U.S. 958 (1973), *cert. denied sub nom.*, 410 U.S. 987 (1973). These assignments of error are overruled.

By her twenty-seventh assignment of error, defendant contends that the trial judge failed to adequately charge the jury on the nature and weight to be given the prior consistent statements used to corroborate the witness' testimony at trial and presents three arguments under this assignment. First, defendant argues that the trial judge should have stated that the evidence was not to be received as substantive evidence. The trial judge did instruct the jury that, "[y]ou must not consider such earlier statements as evidence of the truth of what was said at that earlier time because the statement was not made under oath at this trial." We held in *State v. Lee*, 248 N.C. 327, 103 S.E. 2d 295 (1958), that it is not error, in the absence of a special request, for the trial judge to fail to explain in his charge to the jury the difference between corroborative evidence and substantive evidence. Here, the purpose for which the jury could consider the evidence was adequately explained to the jury during the charge and defendant made no special request for further instructions.

Second, defendant argues that the jury was not instructed that it was the sole determinant of whether the evidence did in fact corroborate the testimony of the witnesses at trial. The judge did instruct the jury that,

*"If you believe* that such earlier statement was made and that it is consistent with the testimony of the witnesses at this trial, then *you may consider* this together with all other facts and circumstances bearing upon the witness' truthfulness *in deciding whether you will believe or disbelieve the witness' testimony at this trial."* (Emphasis added.)

We held in *State v. Case, supra,* that it is not error for the trial judge to fail to include the following part of the instruction on corroborative evidence, "if it does so corroborate her testimony." Here, the jury was adequately instructed that it was the sole determinant of whether or not the prior statements corroborated the witnesses' testimony at trial.

Third, defendant argues that it was error for the trial judge to fail to instruct the jury that it should determine whether the prior statements contained any prior inconsistent statements which would impeach the trial testimony of these witnesses. Such an instruction was given during the trial when the statements were introduced; however, the instruction was not given during the jury charge. Prior inconsistent statements relate to impeaching the credibility of a witness and charging on how evidence relating to the credibility of a witness should be considered is a subordinate feature of the case; therefore, the trial judge is not required to instruct on this feature absent a request for special instruction. *State v. Hart,* 256 N.C. 645, 124 S.E. 2d 816 (1962); *State v. Howard,* 35 N.C. App. 762, 242 S.E. 2d 507 (1978); 4 Strong's N.C. Index 3d, *Criminal Law* § 113.3 and cases cited therein. This assignment of error is overruled.

By her twenty-sixth assignment of error, defendant contends that the trial judge committed prejudicial error in charging the jury that,

"[B]efore you may rely upon circumstantial evidence, to find the defendant guilty, you must be satisfied beyond a reasonable doubt that not only is the circumstantial evidence relied upon by the State is consistent with the defendant being guilty but that it is inconsistent with her being *guilty."* (Emphasis added.)

Of course, the instruction should have ended, "inconsistent with her being *innocent*." The jury was not misled nor the defendant prejudiced by this slight error.

Immediately preceding the above quoted instruction the judge charged the jury as follows:

> "If you have a reasonable doubt as to any one or several of the links [in the chain of circumstantial evidence], then the chain is broken and you would return a verdict of not guilty. The State must prove to you beyond a reasonable doubt each and every link of the chain of circumstances upon which it relies in order for you to return a verdict of guilty as charged.
>
> . . . All of them [independent circumstances] taken together may be strong enough to prove the guilt of the defendant or they may establish her innocence or raise in your mind a reasonable doubt as to her guilt."

Construing the charge contextually, we find no prejudicial error. *State v. Bailey*, 280 N.C. 264, 185 S.E. 2d 683, *cert. denied*, 409 U.S. 948 (1972). Defendant is alleging a technical, insubstantial error that could not have affected the result of the trial, *State v. Gatling*, 275 N.C. 625, 170 S.E. 2d 593 (1969); therefore, this assignment of error is overruled.

[8] By her twenty-ninth assignment of error, defendant contends that the trial judge committed prejudicial error in instructing the jury that, "you are to rely on your own recollection as to what a witness *said or didn't say*." Defendant argues that the last four words of that portion of the charge amount to a grant of authority for the jury to consider any and everything that might have come to their attention during the trial by means other than evidence formally introduced at trial. The defendant does not point out anywhere in the record where anything not formally in evidence was brought before the jury. Also, it is helpful to read the relevant instruction on this point in its entirety which is as follows:

> "I am going to summarize *the evidence in this case.* . . . Let me say to you that you are to rely on your own recollection as to what a witness said or didn't say." (Emphasis added.)

This assignment of error, being absolutely devoid of merit, is overruled.

[9] By her sixteenth, seventeenth and eighteenth assignments of error, defendant contends that test results of and written documents from the State Toxicology Laboratory concerning tests performed on specimens from deceased's body were improperly introduced into evidence because a sufficient chain of custody was not established.

Dr. McCool testified that he is a licensed clinical, anatomical and radioisototic pathologist practicing at Forsyth County Memorial Hospital. On 9 June 1977, he performed an autopsy on the deceased, Don Gene Detter, and he personally removed from the deceased's body samples of hair, fingernails, bile, liver, blood, kidney, urine, stomach content and small bowel content. He placed these specimens in plastic, inner containers and sealed them. These inner containers were placed in pre-labeled mailing containers, sealed and mailed on 13 June 1977 to Dr. McBay, State Toxicology Laboratory, Chapel Hill, North Carolina. Each specimen was sealed in a separate, plastic, inner container but more than one plastic container was placed in some of the mailing containers. The containers were labeled, "Don Gene Detter."

A request form for test analysis, which also contained a written statement of findings by Dr. McCool, was enclosed in one of the mailing containers. It listed the name of the deceased, the origination of the sample (Forsyth County Memorial Hospital), the samples that were sent, the quantity of each sample, the request for analyses, and the date of deceased's death. This form was damaged in the mail due to a leakage from one of the plastic, inner containers. Therefore, a carbon copy of this form was made at the State Laboratory (exhibit 15). This same information was also handwritten on a separate sheet of paper (exhibit 16), and on this exhibit notations of the test results were made as the tests were performed. The original transmittal request form was then destroyed.

Dr. McBay testified that the customary procedure, which was followed in this case, is for one of the laboratory personnel to pick up mailed samples from the Post Office, carry them directly to the State Laboratory and place them on a bench in one of the rooms at the Laboratory. The samples are then opened, removed

from the mailing containers, and matched with the transmittal sheet(s) accompanying them. Dr. McBay then determines what work is to be done and who is to do it. Four or five persons plus Dr. McBay have supervision over and access to the bench where the samples are first placed. The individuals assigned to do the work then remove the samples from the bench, take them to their work area, perform the test(s) and make notations of test results. Here, Dr. McBoling, Jr. performed many of the tests on the deceased's body samples and the notations of test results were made on exhibit 16.

Defendant argues that a chain of custody was not sufficiently established because it is not known exactly which laboratory employee picked up the samples at the Post Office and because several people have supervision over the bench where samples are first placed. This assignment is without merit.

From the above summary of the chain of custody of the deceased's specimens, it is clear that the possibility that the specimens were interchanged with those from another body is too remote to have required ruling this evidence inadmissible. *State v. Montgomery*, 291 N.C. 91, 229 S.E. 2d 572 (1976). An adequate chain of possession, delivery, transporting and safekeeping of these specimens was shown in order to prove that the test results testified to at trial were the results of tests performed on specimens from the body of Don Gene Detter. *State v. Hunt*, 297 N.C. 258, 254 S.E. 2d 591 (1979) (results of tests for arsenic poisoning performed at this same laboratory were properly admitted). Defendant's showings on cross-examination of potential weak spots in the chain of custody relate then only to the weight to be given this testimony. *State v. Montgomery, supra*. This assignment of error is overruled.

By her nineteenth assignment of error, defendant contends that a hypothetical question asked of Dr. McBay by the district attorney did not contain all material facts because the question is devoid of any recitation of fact concerning tests performed on the deceased's body specimens.

The applicable portion of the hypothetical question states:

"Further, that the liver, hair, etc., were taken from Don Detter's body and carried to you *and from the clinical*

*analysis made, and the amount of arsenic found, you found in those organs of Don Gene Detter,* have you a medical opinion, satisfactory to yourself, *based on the above clinical observations and findings and based on the laboratory findings* . . . ." (Emphasis added.)

Therefore, we hold that the laboratory tests and results were included in the list of material facts given the jury in the question.

In *State v. Hensley,* 294 N.C. 231, 240 S.E. 2d 332 (1978), we held that it is not prejudicial error for an opinion by a medical expert to be based upon facts testified to by another witness even if no hypothetical question is asked. In the case *sub judice,* the question was posed in hypothetical terms because the entire series of material facts was prefaced by the statement, "*assuming* the jury should find from the evidence and beyond a reasonable doubt that . . . ." (Emphasis added.)

In *Hensley* we also held that the correct manner in which to ask a hypothetical question is as follows: "Assuming that the jury should believe [the other witness' testimony] . . . ." *State v. Hensley, supra* at 236, 240 S.E. 2d at 335. The references to "you" in the above quoted hypothetical question asked of Dr. McBay in this case ("carried to you" and "you found") appear to be references to the State Toxicology Laboratory. Even if the references are to Dr. McBay individually which would make the statements incorrect since Dr. McBay did not personally perform the tests, the error was nonprejudicial. *See, State v. Hensley, supra.* Here, as in *Hensley,* the correct manner to have asked a hypothetical question of Dr. McBay (rather than simply referring to "you found") would have been to state, "assuming that the jury should believe *the testimony of Dr. McBoling, Jr.* regarding the results of tests performed on deceased's body samples, do you have an opinion . . . ?" Since the error, if any, was nonprejudicial, *id.,* this assignment of error is overruled.

By her sixth assignment of error, defendant contends that the trial judge impermissibly expressed an opinion in violation of G.S. 15A-1222 and G.S. 15A-1232 when he stated during defense counsel's cross-examination of Brooks regarding prior inconsistent statements,

"Ladies and gentlemen, I ask you to consider the answer the witness on the witness stand [sic] and not the way the

question is framed. The questions are leading and it is cross examination; and a lawyer on cross examination has a lot more leeway to lead a witness. You will consider as evidence in this case what the witness says under oath and not the questions as it is asked."

Defendant contends that this instruction to the jury conveyed an opinion by the judge to the jury that what defense counsel was doing was unsound and unworthy of belief or credibility. The entire instruction is a correct proposition of law and as such was an *explanation* to the jury of the applicable law and was not a statement of an opinion. There was no prejudicial error in this remark. *State v. Green*, 268 N.C. 690, 151 S.E. 2d 606 (1966); *see, State v. Best*, 280 N.C. 413, 186 S.E. 2d 1 (1972) (telling the jury to "step into your room, I hate to bother you," was not an expression of an opinion that defendant's position was unsound). This assignment of error is overruled.

[10] By her twentieth and twenty-third assignments of error, defendant contends that there was insufficient evidence to take this case to the jury on a charge of first-degree murder. Considering the evidence in the light most favorable to the State, there is ample evidence that, over a period of time, defendant sought ways to kill her husband and that an eyewitness saw her put arsenic poisoning in deceased's tea, food and ice cream in January, February and March, 1977, through use of Terro Ant killer which contains a lethal dosage of arsenic (300 milligrams). Deceased died on 9 June 1977 and in the opinion of Drs. McBay and Spencer he died of arsenic poisoning. This is sufficient evidence of first-degree murder by means of poisoning to take this case to the jury. G.S. 14-17. (Cum. Supp. 1977). This assignment of error is overruled.

[11] By her twenty-fourth assignment of error, defendant contends that imposition of the death penalty in this case violates the proscription against *ex post facto* laws contained in the United States and North Carolina constitutions. We agree; therefore, the death sentence imposed in this case must be and is vacated and the case is remanded to the Superior Court of Forsyth County for imposition of a life sentence.

Article 1, § 10 of the United States Constitution forbids any state to pass an *ex post facto* law. Article 1, § 16 of the North

Carolina Constitution forbids *ex post facto* laws in this State. The prohibition against *ex post facto* legislation includes the prohibition against passage of a law that changes the punishment for a crime, and inflicts a greater punishment than the law annexed to the crime when committed. *Calder v. Bull*, 3 U.S. 386, 1 L.Ed. 648 (1798). In *State v. Pardon*, 272 N.C. 72, 157 S.E. 2d 698 (1967), our Court, speaking through Justice (later Chief Justice) Sharp, said:

> "Statutes are frequently adopted which change the degree and kind of punishment to be imposed for a criminal act. Where the punishment is increased, and the old law is not expressly or impliedly repealed by the new, which is prospective only in its application, punishment will be imposed under the prior law. (Citations omitted.) Any statutory attempt to increase the punishment of a crime committed before its enactment is of course, invalid as *ex post facto* legislation. (Citations omitted.) . . . The rule is, not that the punishment cannot be *changed*, but that it cannot be *aggravated*." (Citations omitted.) (Emphasis in original.) *Id.* at 75-76, 157 S.E. 2d at 701.

Here, defendant committed all of her efforts to kill her husband in January, February and March, 1977. At that time, the penalty in this State for first-degree murder was life imprisonment as a result of the United States Supreme Court's decision in *Woodson v. North Carolina*, 428 U.S. 280, 49 L.Ed. 2d 944, 96 S.Ct. 2978 (1976) which declared G.S. 14-17 (1974) (automatic death penalty for first-degree murder) unconstitutional. The deceased died on 9 June 1977. Our new death penalty statute, G.S. 15A-2000 *et seq.* became effective 1 June 1977. As of that date, the punishment for first-degree murder became death or life imprisonment as determined in accordance with G.S. 15A-2000. G.S. 14-17 (Cum. Supp. 1977); *State v. Barfield*, 298 N.C. 306, 259 S.E. 2d 510 (1979). As part of that legislation, 1977 N.C. Sess. Laws, Ch. 406, s. 8 provides: "The provisions of this act shall apply to murders committed on or after the effective date of this act."

Therefore, the question presented is whether this murder was committed when the murderous acts were performed so that the punishment is life imprisonment or whether this murder was committed when death resulted so that the sentence of death imposed pursuant to G.S. 15A-2002 is constitutionally permissible

under the *ex post facto* provisions of the United States and North Carolina constitutions. It is true that the definition of murder includes the unlawful killing of a human being with malice aforethought by means of poisoning, in which case premeditation and deliberation are presumed. G.S. 14-17 (Cum. Supp. 1977); *State v. Dunheen*, 224 N.C. 738, 32 S.E. 2d 322 (1944). Therefore, murder is a crime requiring both an act and a result. We held in *State v. Williams*, 229 N.C. 348, 49 S.E. 2d 617 (1948), that one who rendered aid after the fatal blow was struck but before the resulting death could not be convicted of accessory after the fact to murder because the crime of murder was not complete until the resulting death occurred.

However, when it becomes necessary to choose between the time the fatal blow is struck or the time of death for some special purpose, such as accessory after the fact to murder or to determine if a certain punishment is barred by the *ex post facto* clause, the choice should be dictated by the nature of the inquiry. Perkins, Criminal Law (2d ed. 1969). Therefore, our decision in *State v. Williams, supra,* in which we chose the time of death as the time the murder was committed for the purpose of deciding if defendant was an accessory after the fact to murder, is sound, although, for purposes of the prohibition against *ex post facto* legislation, we hold that the date(s) of the murderous acts rather than the date of death is the date the murder was committed. The scant authority that exists on this question is in accord with our holding here. *People v. Gill*, 6 Cal. 637 (1856); *Debney v. State*, 45 Neb. 856, 64 N.W. 446 (1895); *Perkins, supra*; LaFave & Scott, Criminal Law § 12 (1972); 40 Am. Jur. 2d *Homicide* § 3.

Therefore, for purposes of this decision and application of the prohibition against *ex post facto* legislation, we hold that the date the murderous acts were performed is the date the murder was committed. All of the murderous acts here were committed before 1 June 1977 at a time when the maximum punishment for first degree murder was life imprisonment. Therefore, imposition of the sentence of death under G.S. 15A-2002 in this case violates the prohibition against imposition of an *ex post facto* punishment and the sentence is therefore, vacated. The legislature has provided that when application of the death penalty to a defendant is declared unconstitutional for any reason, then the punishment is life imprisonment. 1977 N.C. Sess. Laws, Ch. 406, s. 6.

Accordingly, this case is remanded to the Superior Court of Forsyth County with directions (1) that the presiding judge, without requiring the presence of defendant, enter judgment imposing life imprisonment for the first-degree murder of which defendant has been convicted, and (2) that, in accordance with this judgment, the clerk of the superior court issue commitment in substitution for the commitment heretofore issued. It is further ordered that the clerk furnish to the defendant and her attorney a copy of the judgment and commitment as revised in accordance with this opinion. *See, State v. Harding,* 291 N.C. 223, 230 S.E. 2d 397 (1976).

Due to our holding under the *ex post facto* clauses of the North Carolina and United States constitutions and our remand of this case to the Superior Court of Forsyth County for imposition of a life sentence, it is unnecessary for us to discuss defendant's thirty-third, thirty-fourth and thirty-fifth assignments of error which relate to alleged errors committed during the sentencing phase of her bifurcated trial at which the death sentence was imposed.

Defendant's remaining twelve assignments of error were not brought forward and discussed or argued in her brief; therefore, they are deemed abandoned. Rule 28(a), (b)(3), Rules of Appellate Procedure; *State v. Fowler,* 285 N.C. 90, 203 S.E. 2d 803 (1974), *death sentence vacated,* 428 U.S. 904 (1976); 4 Strong's N.C. Index 3d, *Criminal Law* § 166 and cases cited therein.

Due to the seriousness of the charge and conviction in this case we have combed the entire record carefully and exhaustively and find that defendant's trial was conducted free of prejudicial and constitutional error except with respect to defendant's argument concerning the *ex post facto* clause. Accordingly we hold:

Guilt determination phase: No error.

Sentencing phase: Death sentence vacated; case remanded for imposition of life sentence.

Justice BROCK did not participate in the consideration or decision of this case.