**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**SAYLOR, C.J., EAKIN, BAER, TODD, STEVENS, JJ.**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : No. 26 WAP 2014 |
| | : |
| Appellant | : Appeal from the Order of the Superior |
| | : Court entered November 25, 2013 at No. |
| | : 45 WDA 2011, vacating the Judgment of |
| v. | : Sentence of the Court of Common Pleas |
| | : of Allegheny County entered December 7, |
| | : 2010 at No. CP-02-CR-0000810-2008 and |
| STEVENSON LEON ROSE, | : remanding. |
| | : |
| Appellee | : ARGUED:  April 8, 2015 |

**OPINION**

**MADAME JUSTICE TODD**                    **DECIDED: NOVEMBER 18, 2015**

The issue in this discretionary appeal is whether a defendant convicted of third-degree murder must be sentenced under the sentencing statute in effect at the time the defendant committed the ultimately deadly assault upon the victim, or whether the defendant is subject to an enhanced penalty pursuant to a subsequently-enacted sentencing statute which was in effect at the time of the victim's death 14 years later. As we conclude that imposition of a sentence in excess of that prescribed by statute at the time the defendant committed the deadly assault violates and is prohibited by the Ex Post Facto Clause of the United States Constitution, we are constrained to affirm the

order of the Superior Court vacating Appellee Stevenson Leon Rose's sentence and remanding for resentencing.[1]

## I. Factual and Procedural Background

The facts of this case are particularly heinous. On July 13, 1993, Appellee Rose and Shawn Sadik brutally attacked Mary Mitchell in a park in the East Liberty neighborhood of Pittsburgh. During the attack, the men kicked the victim in the head approximately 60 times, stabbed her in the throat, and inserted a 16-inch piece of aluminum framing into her vagina, causing serious internal injuries. The victim was left naked and bleeding until she was discovered by two individuals. The attack left the victim in a vegetative state. An investigation led police to Rose and Sadik, and police recovered bloody clothing and shoes from Rose's apartment later that day. Rose provided police with a statement in which he admitted that he and Sadik attacked the victim after drinking and doing drugs.

In March 1994, a jury convicted Rose of attempted murder,[2] aggravated assault,[3] involuntary deviate sexual intercourse,[4] recklessly endangering another person,[5] and criminal conspiracy,[6] and, on March 16, 1994, he was sentenced to 15 to 30 years incarceration. His judgment of sentence was affirmed on appeal by the Superior Court, and this Court denied his petition for allowance of appeal. Commonwealth v. Rose, 664 A.2d 1059 (Pa. Super. 1995), *appeal denied*, 672 A.2d 306 (Pa. 1995).

---

[1] Our decision herein does not alter Rose's original aggregate sentence of 15 to 30 years incarceration for his 1994 conviction for attempted murder and related offenses. Our holding speaks only to the sentence that may be constitutionally imposed for Rose's subsequent conviction in 2007 for third-degree murder.

[2] 18 Pa.C.S. § 901(a).

[3] 18 Pa.C.S. § 2702(a)(1).

[4] 18 Pa.C.S. § 3123 (1972).

[5] 18 Pa.C.S. § 2705.

[6] 18 Pa.C.S. § 903.

On September 17, 2007, the victim succumbed to the injuries she sustained in the attack 14 years earlier, and, on October 9, 2007, the Commonwealth charged Rose with criminal homicide.[7] Rejecting his diminished capacity defense,[8] the jury convicted Rose of third-degree murder.[9] At sentencing, Rose maintained that he could be sentenced only to a maximum term of incarceration of 10 to 20 years, because, at the time he assaulted the victim, that was the maximum allowable sentence for third-degree murder under 18 Pa.C.S. § 1103(1), which provides that a person convicted of a felony of the first degree may be sentenced "for a term which shall be fixed by the court at not more than 20 years." 18 Pa.C.S. § 1103(1). The Commonwealth argued, however, that because the victim's death did not occur until 2007, Rose's crime of homicide was not "complete" until that time, and, therefore, Rose was subject to the 20 to 40 year sentence for third-degree murder prescribed under 18 Pa.C.S. § 1102, which was amended in 1995 (two years after the attack) and provides: "Notwithstanding section 1103, a person who has been convicted of murder of the third degree . . . shall be sentenced to a term which shall be fixed by the court at not more than 40 years." 18 Pa.C.S. § 1102(d). The sentencing court agreed with the Commonwealth, and sentenced Rose to 20 to 40 years incarceration. Rose was credited with approximately 17½ years of time served for his prior conviction.

Rose appealed, and a panel of the Superior Court vacated his sentence and remanded for resentencing. The Commonwealth requested, and was granted, *en banc*

---

[7] At common law, a person could not be convicted of murder unless the victim died within a year and a day "from the time the fatal blow was given or the cause of death administered." Commonwealth v. Ladd, 166 A.2d 501, 504 (Pa. 1960). In Ladd, however, this Court concluded that the common law rule was a rule of evidence, and not part of the definition of murder. Id.

[8] Rose asserted a voluntary intoxication defense at trial.

[9] 18 Pa.C.S. § 2502(c).

review by the Superior Court. The *en banc* panel of the Superior Court, in an opinion written by Judge Mary Jane Bowes, recognized that "[n]either the framers nor the ratifiers of the Pennsylvania or federal constitution contemplated application of the *ex post facto* law to the factual situation herein," and, further, that no Pennsylvania case has yet addressed the issue. Commonwealth v. Rose, 81 A.3d 123, 129 (Pa. Super. 2013) (*en banc*).[10] However, the court found instructive the decisions of other states that have addressed analogous issues, see infra, and reasoned that, "[a]lthough the crime of third degree murder was not consummated until the victim died, all of the criminal acts causing the victim's death were completed" prior to the enactment of Section 1102(d), which increased the penalty for the acts that caused the victim's death. Id. at 136. Accordingly, the *en banc* court concluded Rose's sentence of 20 to 40 years violated the Ex Post Facto Clauses of both the United States and Pennsylvania Constitutions. Then-Judge, now-President Judge, Susan P. Gantman filed a dissenting opinion, which was joined by Judge Cheryl Allen. Judge Gantman opined that, because a murder is "committed only when the victim of the assault dies," the trial court properly sentenced Rose for third-degree murder under the sentencing statute in effect at the time of the victim's death in 2007. Id. at 136-37. The Commonwealth filed a petition for allowance of appeal with this Court, which we granted in order to consider whether the Superior Court erred in holding that sentencing Rose pursuant to 18 Pa.C.S. § 1102(d), which became effective after he committed the deadly assault on the victim, but before the victim died, would violate the prohibition against *ex post facto* laws.

## II. The Ex Post Facto Clause

---

[10] As the Superior Court observed, Rose's challenge to Section 1102(d) is an "as applied" challenge to its constitutionality, in that he does not contend the law is unconstitutional as written, but that its application to him in this instance is unconstitutional. Rose, 81 A.3d at 126-27.

The Ex Post Facto Clause of the United States Constitution is contained in Article 1, § 10, which provides: "No State shall . . . pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts . . . ."  U.S. Const. art. I, § 10.[11]  The definition of an *ex post facto* law in the context of American law was first set forth more than two centuries ago in Calder v. Bull, 3 U.S. (3 Dall.) 386 (1798), wherein Justice Chase offered the following description of the term:

> 1st.  Every law that makes an action, done before the passing of the law, and which was innocent when done, criminal; and punishes such action.  2nd.  Every law that aggravates a crime, or makes it greater than it was, when committed.  3rd.  Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.  4th.  Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.

3 U.S. (3 Dall.) 386, 390 (1798).  As noted by the lower courts in the instant case, Rose's sentence implicates the third Calder category, in that it arguably increases the punishment for his crime of third-degree murder at the time of the victim's death from

---

[11] As the Ex Post Facto Clause of the United States and the Ex Post Facto Clause of the Pennsylvania Constitution, Art. 1, § 17, are virtually identical in language, this Court has explained that the standards applied to determine *ex post facto* violations under both constitutions are comparable, and a law that violates an appellant's federal *ex post facto* rights will be held violative of his state *ex post facto* rights.  Commonwealth v. Young, 637 A.2d 1313, 1317 n.7 (Pa. 1993).  In light of our determination that the trial court's sentence violated Rose's federal *ex post facto* rights, we need not separately consider whether his sentence also violated his rights under the Pennsylvania Constitution.

the punishment that was applicable at the time he committed the acts which led to the victim's death.

The phrase "'*ex post facto* law' was a term of art with an established meaning at the time of the framing." Peugh v. United States, 133 S.Ct. 2072, 2081 (2013) (quoting Collins v. Youngblood, 497 U.S. 37, 41 (1990)).[12]  The high Court has observed that, "[b]uilding on Justice Chase's formulation of what constitutes an '*ex post facto* Law,' our cases 'have not attempted to precisely delimit the scope of this Latin phrase, but have instead given it substance by an accretion of case law.'"  Id. (quoting Dobbert v. Florida, 432 U.S. 282, 292 (1977)).

The *ex post facto* prohibition

> forbids the Congress and the States to enact any law "which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed."  Through this prohibition, the Framers sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed.  The ban also restricts governmental power by restraining arbitrary and potentially vindictive legislation.

Weaver v. Graham, 450 U.S. 24, 28-29 (1981) (footnotes and citations omitted); see also Miller v. Florida, 482 U.S. 423, 430 (1987) ("[A]lmost from the outset, we have recognized that central to the ex post facto prohibition is a concern for 'the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated.'" (quoting Weaver, 450 U.S. at

---

[12] One commentator has suggested that "[o]ne who reads the surviving record of the constitutional debates of 1787-88 cannot avoid the conclusion that the policy against statutory retroactivity was a major force behind the adoption of the U.S. Constitution." Robert G. Natelson, Statutory Retroactivity: The Founders' View, 39 Idaho L. Rev. 489, 527 (2003).

30)), *disapproved in part on other grounds* <u>Calif. Dep't of Corrections v. Morales</u>, 514 U.S. 499, 506 n.3 (1995).[13]

In addition, the *ex post facto* prohibition "upholds the separation of powers by confining the legislature to penal decisions with prospective effect and the judiciary and executive to applications of existing penal law." <u>Weaver</u>, 450 U.S. at 29 n.10. In discussing the protections afforded by the Ex Post Facto Clause, one scholar observed an additional asserted basis for the protection: "namely, that it 'assures the legislature can make recourse to stigmatizing penalties of the criminal law only when its core purpose of deterrence could thereby possibly be served.'" Wayne R. LaFave, Criminal Law 116 (5th ed. 2010) (hereinafter "LaFave") (citations omitted).

The *ex post facto* prohibition is concerned with legislative acts, as opposed to judicial decisions. <u>Rogers v. Tennessee</u>, 532 U.S. 451 (2001). In <u>Rogers</u>, the Supreme Court rejected the petitioner's suggestion that, because both the Due Process and Ex Post Facto Clauses safeguard the interest in fundamental fairness (through notice and fair warning) and the prevention of arbitrary and vindictive legislation, the strictures of the Ex Post Facto Clause should be extended to the context of judicial construction. Acknowledging that its opinion in <u>Bouie v. City of Columbia</u>, 378 U.S. 347 (1964), contains "some expansive language that is suggestive of the broad interpretation for which petitioner argues," <u>Rogers</u>, 532 U.S. at 458, the high Court held:

---

[13] On this latter point, another commentator has suggested that the theory that the Ex Post Facto Clause restricts governmental power by restraining arbitrary and vindictive legislation "bears no substance beyond that borne by the first and primary concern for notice," in that "[a] law may be condemned as irrationally spiteful or as an impermissible breach of restrictions on legislative power, but the constitutional basis for that review will not be the Ex Post Facto Clause unless the spitefulness or overreach takes the form of retroactive punishment." Andrew C. Adams, <u>One-Book, Two Sentences: Ex Post Facto Considerations of the One-Book Rule after United States v. Kumar</u>, 39 Am. J. Crim. L. 231, 236 (2012).

> Extending the [Ex Post Facto] Clause to courts through the rubric of due process . . . would circumvent the clear constitutional text. It also would evince too little regard for the important institutional and contextual differences between legislating, on the one hand, and common law decisionmaking, on the other.

Id. at 460.

In order for a criminal or penal law to be deemed an *ex post facto* law, "two critical elements" must be met: "it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." Weaver, 450 U.S. at 29 (footnote omitted); see also Young, 637 A.2d at 1318 ("Only those laws which disadvantage a defendant *and* fall within a Calder category are ex post facto laws and constitutionally infirm." (emphasis original)).

The Commonwealth does not dispute that sentencing Rose on his third-degree murder conviction under 18 Pa.C.S. § 1102(d), which provides a maximum sentence of 40 years incarceration, instead of 18 Pa.C.S. § 1103(1), which provides a maximum sentence of 20 years, disadvantages Rose by subjecting him to an increased sentence. We thus focus on the question of whether imposition of a sentence pursuant to Section 1102(d) constitutes a retroactive application of the sentencing statute.

In asserting the Superior Court erred in holding that a sentence for third-degree murder pursuant to 18 Pa.C.S. § 1102(d) violates Rose's *ex post facto* rights under Calder's third category because it inflicts upon Rose a greater punishment than the statute in effect at the time he assaulted the victim, the Commonwealth stresses that the Ex Post Facto Clause "only prohibits the legislature from increasing the punishment against a defendant for his *past crimes.*" Commonwealth's Brief at 20 (emphasis added). As noted above, the Commonwealth maintains that, because the death of the victim is an essential element of the crime of criminal homicide, Rose's crime of

homicide was not complete until 2007, the year the victim died.  Id. at 24-25 (citing Commonwealth v. Ramunno, 68 A. 184 (Pa. 1907) ("Murder is committed only when the victim of the assault dies.")).  Accordingly, the Commonwealth contends that, because Rose was sentenced under the statute in effect at the time of the victim's death in 2007, there was no retroactive application of a sentencing statute, and, thus, no *ex post facto* violation.[14]

In support of its position, the Commonwealth relies on the language of Pennsylvania's Crimes Code, which provides, in relevant part, that "[a] person is guilty of criminal homicide if he intentionally, knowingly, recklessly or negligently causes the death of another human being." 18 Pa.C.S. § 2501(a).  The Commonwealth observes that, pursuant to 42 Pa.C.S. § 5552, "[a]n offense is committed either when every element occurs, or, if a legislative purpose to prohibit a continuing course of conduct plainly appears, at the time when the course of conduct or the complicity of the defendant therein is terminated." 42 Pa.C.S. § 5552(d).  The Commonwealth further notes that the legislature has defined the phrase "element of an offense," as "[s]uch conduct or such attendant circumstances or such a result of conduct as . . . is included in the description of the forbidden conduct in the definition of the offense." 18 Pa.C.S. § 103.  In reference to the Calder categories described above, the Commonwealth contends that the Superior Court, in reaching its conclusion, "conspicuously discarded the word 'crime' expressly used in the third Calder category and replaced it with the

---

[14] Rose's crime of third-degree murder in the instant case may be characterized as a "straddle offense."  In his law review article "On Straddle Crimes and the Ex Post Facto Clauses," J. Richard Broughton defines straddle offenses as crimes involving elements which occur both before and after a change in the law that either criminalizes the combination of elements or increases the punishment for their completion. J. Richard Broughton, On Straddle Crimes and the Ex Post Facto Clauses, 18 Geo. Mason L. Rev. 719, 720 (Spring 2011) (hereinafter "Broughton"); see also U.S. v. Zimmer, 299 F.3d 710, 718 (8th Cir. 2002).

word 'acts.'" Commonwealth's Brief at 29. According to the Commonwealth, the Superior Court's substitution in this regard conflates Calder's first and third *ex post facto* categories, and extends the third category beyond what was intended. Id.

Rose, on the other hand, maintains that the Superior Court's holding is correct, and that the court properly rejected the Commonwealth's suggestion that the *ex post facto* prohibition applies only to prior completed crimes, and not to prior conduct. Rose avers that neither this Court nor the United States Supreme Court has expressly limited application of the Ex Post Facto Clause in this manner, and instead have accepted a more expansive definition, which, consistent with the original meaning of the federal and state Ex Post Facto Clauses, encompasses past acts, conduct, or activity. Rose further offers that other state appellate courts which have faced this issue have uniformly held that the Ex Post Facto Clause prohibits increased punishment for such prior criminal acts.

Regarding the Commonwealth's position that, because the offense of criminal homicide requires the death of the victim, Rose did not "commit" the crime of homicide until 2007, and, thus, there was no retroactive application of a sentencing statute, there does not appear to be any Pennsylvania caselaw governing this set of circumstances. However, the North Carolina Supreme Court addressed a similar situation in State v. Detter, 260 S.E.2d 567 (N.C. 1979). In Detter, the defendant attempted to kill her husband on several occasions between January and March 1977 by poisoning him with concentrated lead, ant killer, and various drugs, including cocaine and PCP. The victim died on June 9, 1977, and an autopsy revealed he died of arsenic poisoning, the primary ingredient in ant killer. The defendant was convicted of first-degree murder and sentenced to death. On appeal, she argued, *inter alia*, that imposition of a death sentence violated her *ex post facto* rights because, at the time she engaged in all of her

efforts to kill her husband, the maximum penalty for first-degree murder was life imprisonment, as North Carolina's death penalty statute did not take effect until June 1, 1977. The court explained:

> [T]he question presented is whether this murder was committed when the murderous acts were performed so that the punishment is life imprisonment or whether this murder was committed when death resulted so that the sentence of death imposed pursuant to G.S. 15A-2002 is constitutionally permissible under the Ex post facto provisions of the United States and North Carolina constitutions. It is true that the definition of murder includes the unlawful killing of a human being with malice aforethought by means of poisoning, in which case premeditation and deliberation are presumed. . . . Therefore, murder is a crime requiring both an act and a result. We held in State v. Williams, [49 S.E.2d 617 (N.C. 1948)], that one who rendered aid after the fatal blow was struck but before the resulting death could not be convicted of accessory after the fact to murder because the crime of murder was not complete until the resulting death occurred.
>
> **However, when it becomes necessary to choose between the time the fatal blow is struck or the time of death for some special purpose, such as accessory after the fact to murder or to determine if a certain punishment is barred by the Ex post facto clause, the choice should be dictated by the nature of the inquiry.** Perkins, Criminal Law (2d ed. 1969).

Id. at 590 (emphasis added). The court continued:

> Therefore, our decision in State v. Williams . . . in which we chose the time of death as the time the murder was committed for the purpose of deciding if defendant was an accessory after the fact to murder, is sound, although, for purposes of the prohibition against Ex post facto legislation, we hold that the date(s) of the murderous acts rather than the date of death is the date the murder was committed.

Id.

The Detter court observed that the "scant authority that exists on this question" was consistent with its holding. Id. Specifically, the court cited People v. Gill, 6 Cal. 637 (1856), and Debney v. State, 45 Neb. 856, 64 N.W. 446 (1895). In Gill, the defendant attacked a victim; a month later, the California legislature divided the crime of murder into first and second degree. The victim subsequently died of the injuries suffered in the attack, and the defendant was tried and convicted of second-degree murder, for which he was subject to a potential life sentence. The court, without expressly discussing the Ex Post Facto Clause, resolved:

> The blow was given before, but the death ensured after, the passage of the last statute. The death must be made to relate back to the unlawful act which occasioned it, and as the party died in consequence of wounds received on a particular day, the day on which the act was committed, and not the one on which the result of the act was determined, is the day on which the murder is properly to be charged.

6 Cal. at 638.

In Debney, the Supreme Court of Nebraska, referencing Gill, supra, and observing that a crime is deemed committed in the county where the fatal wounds were given, even if the victim died in another county, reasoned:

> [I]t follows that the offense was committed when such wounds were inflicted. True, the death occurred at a subsequent date, but it relates back to the time the mortal injury was received. The accused committed all the acts constituting the offense on July 4th; the death which ensued in Platte county, on July 9th, merely characterized his acts. The crime of murder consists in intentionally and unlawfully causing the death, and, while it is true that the crime is not complete until death occurs, yet it is incorrect to say that the death is an element in the crime. It is merely a necessary condition to it. The elements of the crime are the acts of the perpetrator, such as the malice, intent, and the wound or blow. The crime was committed when the mortal wounds were inflicted, and he is to be tried by the laws then in force.

64 N.W. at 448.[15]

Other courts have since relied on <u>Detter</u> for the proposition that the date of an offense for one purpose, such as meeting the statutory elements of a crime, may be different than the date of the offense for another purpose, such as an *ex post facto* inquiry. In <u>Little v. United States</u>, 709 A.2d 708 (D.C. App. 1998), for example, the court held that the defendant could not be convicted of being an accessory after the fact to murder based on actions taken while the decedent was still alive, where the victims were still alive at the time the defendant drove away from the scene of the crime. In so holding, the court relied on <u>Detter</u>'s "nature of the inquiry" language, and noted "[t]he fact that a homicide is complete for one purpose does not make it complete for all purposes." <u>Id.</u> at 712 n.9.

Consistent with the foregoing authority, including the North Carolina Supreme Court's approach in <u>Detter</u>, we conclude that, for purposes of evaluating whether a defendant's sentence violates the Ex Post Facto Clause, the date on which all of the elements of the statutory crime of third-degree murder are met, including the death of the victim, is not dispositive. Rather, in determining whether imposition of a sentence under a statute that was amended after a defendant committed the deadly acts upon the victim, but prior to the victim's death, violates the *ex post facto* prohibition, we must consider the intent behind the Ex Post Facto Clause.

---

[15] In addition to the decisions in <u>Gill</u> and <u>Debney</u>, the <u>Detter</u> Court also found support for its holding in several treatises, including Perkins, Criminal Law (2nd ed. 1969), and LaFave & Scott, Criminal Law 93-94 (1972) ("With those crimes which consist of both conduct and the result of conduct, as is the case with criminal homicide, . . . [i]f the theory behind the prohibition on retroactivity is that of giving fair warning, it seems clear that for ex post facto purposes the date of the blow should be the date of the offense.").

Nearly a century ago, in Beazell v. Ohio, the United States Supreme Court offered the following definition of an *ex post facto* law, alluding to, *inter alia*, Justice Chase's opinion in Calder:

> It is settled, by decisions of this court so well known that their citation may be dispensed with, that any statute which punishes as a crime an act previously committed, which was innocent when done, which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as ex post facto.

269 U.S. 167, 169-70 (1925). Examining the underlying rationale of the *ex post facto* prohibition, the Beazell Court explained:

> The constitutional prohibition and the judicial interpretation of it rest upon the notion that laws, whatever their form, which purport to make innocent acts criminal after the event, or to aggravate an offense, are harsh and oppressive, and that the criminal quality attributable to an act, either by the legal definition of the offense or by the nature or amount of the punishment imposed for its commission, should not be altered by legislative enactment, after the fact, to the disadvantage of the accused.

Id. at 170.

The high Court again discussed the characteristics of an *ex post facto* law in De Veau v. Braisted, emphasizing that the essence of an *ex post facto* law is the punishment for prior **acts**:

> The mark of an ex post facto law is the imposition of what can fairly be designated punishment for **past acts**. The question in each case where unpleasant consequences are brought to bear upon an individual for prior **conduct**, is whether the legislative aim was to punish that individual for **past activity**, or whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation.

363 U.S. 144, 160 (1960) (emphasis added).

In 1981, the high Court in <u>Weaver</u>, <u>supra</u>, held that a Florida statute that repealed a prior statute and reduced the amount of "gain time" for good conduct a state prisoner could receive against his sentence violated the *ex post facto* rights of a prisoner who pled guilty to second-degree murder and was sentenced before the statute's effective date. In so holding, the Court first explained that the "presence or absence of an affirmative, enforceable right is not relevant . . . to the *ex post facto* prohibition, which forbids the imposition of punishment more severe than the punishment assigned by law when the **act** to be punished occurred." <u>Weaver</u>, 450 U.S. at 30 (emphasis added). In rejecting the State's argument that the new statute was not retrospective because, on its face, it applied only after its effective date, the Court concluded "[t]his argument fails to acknowledge that it is the effect, not the form, of the law that determines whether it is *ex post facto*. The critical question is whether the law changes the legal consequences of **acts** completed before its effective date." <u>Id.</u> at 31 (emphasis added). The Court further observed:

> "The Constitution deals with substance, not shadows. Its inhibition was levelled at the thing, not the name. It intended that the rights of the citizen should be secure against deprivation for past **conduct** by legislative enactment, under any form, however disguised." <u>Cummings v. Missouri</u>, 4 Wall. 277, 325, 18 L.Ed. 356 (1867).

<u>Id.</u> at 31 n.15 (emphasis added).

More than 60 years after <u>Beazell</u>, the high Court, in <u>Collins v. Youngblood</u>, 497 U.S. 37 (1990), reaffirmed the <u>Beazell</u> definition of the term "ex post facto law" and its focus on acts:

> The <u>Beazell</u> formulation is faithful to our best knowledge of the original understanding of the *Ex Post Facto* Clause: Legislatures may not retroactively alter the definition of

crimes or increase the punishment **for criminal acts**. Several early State Constitutions employed this definition of the term, and they appear to have been a basis for the Framers' understanding of the provision. See The Federalist No. 44, p. 301 (J. Cooke ed. 1961) (J. Madison); 2 M. Farrand, Records of the Federal Convention of 1787, p. 376 (1911); Calder, 3 Dall., at 391-392 (opinion of Chase, J.); id., at 396-397 (opinion of Paterson, J.). The Constitutions of Maryland and North Carolina, for example, declared that "retrospective laws, punishing facts committed before the existence of such laws, and by them only declared criminal, are oppressive, unjust, and incompatible with liberty; wherefore no *ex post facto* law ought to be made." See Constitution of Maryland, Declaration of Rights, Art. XV (1776); Constitution of North Carolina, Declaration of Rights, Art. XXIV (1776). Other State Constitutions, though not using the phrase "*ex post facto*," included similar articles. See Declaration of Rights and Fundamental Rules of the Delaware State § 11 (1776); Constitution or Form of Government for the Commonwealth of Massachusetts, Declaration of Rights, Art. XXIV (1780).

Another historical reference, Blackstone's Commentaries, which was discussed by the Framers during debates on the Ex Post Facto Clause, see 2 M. Farrand, Records of the Federal Convention of 1787, pp. 448-449 (1911), and deemed an authoritative source of the technical meaning of the term in Calder, see 3 Dall., at 391 (opinion of Chase, J.); id., at 396 (opinion of Paterson, J.), buttresses this understanding. According to Blackstone, a law is *ex post facto* "**when after an action (indifferent in itself) is committed**, the legislator then for the first time declares it to have been a crime, and inflicts a punishment upon the person who has committed it." 1 W. Blackstone, Commentaries. Although increased punishments are not mentioned explicitly in the historical sources, the Court has never questioned their prohibition, apparently on the theory that "[t]he enhancement of a crime, or penalty, seems to come within the same mischief as the creation of a crime or penalty." Calder, supra, at 397 (opinion of Paterson, J.). The Beazell definition, then, is faithful to the use of the term "*ex post facto law*" at the time the Constitution was adopted.

497 U.S. at 43-44 (emphasis added).

Although the Commonwealth maintains that the *ex post facto* prohibition applies only to prior completed crimes,[16] not prior acts, the language employed by the Court in Beazell, De Veau, Weaver, and Youngblood suggests that the Ex Post Facto Clause was intended to prohibit the legislature from retroactively increasing the punishment not simply for completed crimes, but for an individual's prior criminal acts. See also Broughton, at 728 (suggesting that the meaning of the phrase "acts completed," as referred to in Weaver, "does not necessarily mean a fully completed crime. Rather, it could refer to the completion or fulfillment of any part of the actus reus of a crime or any element of the crime that requires an affirmative act on the part of the defendant.").

Indeed, criminal law scholar Wayne R. LaFave has opined that, in determining the date of an offense for *ex post facto* purposes, it is the date of the **criminal act** which is relevant:

> With those crimes that consist of both conduct and the result of conduct, as is the case with criminal homicide (a blow with a resulting death is needed), there may arise a question as

---

[16] The Commonwealth acknowledges that "the United States Supreme Court has conflated the words 'acts' and 'crime' or 'acts' and 'offense' when analyzing Calder questions," and specifically references the high Court's language in Peugh, supra:

> We consider here whether there is an *ex post facto* violation when a defendant is sentenced under Guidelines promulgated after he committed his criminal acts and the new version provides a higher applicable Guidelines sentencing range than the version in [] place at the time of the offense.

Commonwealth Brief at 35 (quoting Peugh, 133 S.Ct. at 2078). The Commonwealth contends, however, "that lack of precision in phrasing does not a constitutional protection make because in Peugh, the difference between the two words did not control the question before the Court." Id. The Commonwealth fails to address the high Court's recurring use of the term "act" in the other cases discussed above; indeed, the Commonwealth's brief contains no reference to Beazell, De Veau, or Weaver.

to the time of the offense for purposes of applying the ex post facto clause. Thus, if the defendant delivers the mortal blow on April 1, a new homicide statute becomes law on April 10, and the victim dies from his wounds on April 20, can the new statute, if disadvantageous to the defendant, constitutionally be applied to his situation? **If the theory behind the prohibition on retroactivity is that of giving fair warning, it seems clear that for ex post facto purposes the date of the blow should be the date of the offense.**

LaFave, at 121 (emphasis added); see also Joseph G. Cook, Constitutional Rights of the Accused § 1:18 (3rd ed.) (July 2015) (hereinafter "Cook") ("For ex post facto law purposes . . . it is the time of the acts rather than the time of the result which is key. Such results are consistent with insuring that the accused has received notice of the criminality and potential consequences of his act.").

The courts of our sister states have similarly concluded that, for purposes of determining the date of an offense when evaluating an *ex post facto* claim, the date on which the criminal act was committed is controlling. See, e.g., Detter, 260 S.E.2d at 590 (for purposes of the prohibition against *ex post facto* legislation, "the date(s) of the murderous acts rather than the date of death is the date the murder was committed.") Id. at 590; State v. Masino, 43 So.2d 685, 687 (La. 1949) (noting that, for *ex post facto* purposes, "the crime is committed on the date on which the deed, the original act, is performed, and not on the date of the victim's death").[17] This focus on acts is consistent with one of the Ex Post Facto Clause's underlying rationales − fair warning. See Miller, 482 U.S. at 430; Weaver, 450 U.S. at 28-29; see also Broughton, at 728; LaFave, at 121; Cook, at § 1:18.

---

[17] In State v. Hare, 208 N.W.2d 264, 267 (Neb. 1973), the Nebraska Supreme Court, in addressing a sufficiency challenge, likewise held "in a prosecution for manslaughter in the commission of an assault and battery, the time of the offense is affixed at the time the fatal blow was struck."

In the case *sub judice,* Rose's assault on the victim occurred in 1993, when the maximum sentence for third-degree murder was 20 years imprisonment. Although the legislature later increased the maximum sentence for third-degree murder to 40 years imprisonment, all of Rose's criminal acts occurred prior to the increase, and, at the time he committed the criminal acts, he could not have had fair warning that he could face 40 years imprisonment if the victim died as a result of his actions.

Notwithstanding the above, the Commonwealth maintains that the "right to fair warning" protected by the Ex Post Facto Clause is not implicated in the instant case because Rose was convicted of third-degree murder, which does not require specific intent. Commonwealth's Brief at 34. The Commonwealth highlights the following observation by the Superior Court below:

> Where the individual does not possess a specific intent to commit the crime, he cannot possibly be contemplating potential punishment for the crime. Therefore, notice of a particular punishment cannot dissuade the commission of the offense where there is no intent requirement for the crime. Phrased differently, the notice interest that the ex post facto clauses (sic) was intended to serve is weakest when the third <u>Calder</u> category is at issue and at its strongest when the first two categories are in question.

Commonwealth's Brief at 34 (quoting <u>Rose</u>, 81 A.3d at 134). In effect, the Commonwealth contends that the prohibition against *ex post facto* laws does not apply to unintentional crimes.

However, in the sentence following the above-quoted language, the Superior Court, quoting the United States Supreme Court, concluded: "Of course, 'the absence of a reliance interest is not an argument in favor of abandoning the category itself.'" <u>Rose</u>, 81 A.3d at 134 (quoting <u>Carmell v. Texas</u>, 529 U.S. 513, 531 n.21 (2000)). In <u>Carmell</u>, the high Court considered an *ex post facto* challenge to a Texas law, an amendment to

which altered the rules of evidence for crimes committed prior to the amendment. The defendant was charged with committing sexual offenses against his stepdaughter between 1991 and 1995, when the victim was between 12 and 16 years old. At that time, Texas law provided that testimony of a victim over the age of 14 could not support a conviction unless corroborated by other evidence, or the victim had informed another person of the offense within six months of its occurrence. If a victim was under the age of 14, the victim's testimony alone could support a conviction. In 1993, the law was amended to allow a conviction based on a victim's testimony alone if the victim was under the age of 18. The defendant was convicted in 1996, and on appeal, he argued that his convictions on the four counts that were based on conduct that occurred after the victim turned 14 could not stand under the pre-1993 version of the law because the victim was not under 14 and had not made a timely outcry.

In reversing the defendant's four convictions, the high Court concluded the amendment to the law violated the Ex Post Facto Clause, as the amendment fell within Calder's fourth category, authorizing a conviction on less evidence than previously required. The Court opined, "[t]he fourth category, so understood, resonates harmoniously with one of the principal interests that the Ex Post Facto Clause was designed to serve, fundamental justice." 529 U.S. at 531. The Court further observed:

> The Clause is, of course, also aimed at other concerns, "namely that legislative enactments give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed," . . . and at reinforcing the separation of powers . . . . But those are not its only aims, and the absence of a reliance interest is not an argument in favor of abandoning the category itself. If it were, the same conclusion would follow for Calder's third category (increases in punishment), as there are few, if any, reliance interests in planning future criminal activities based on the expectation of less severe repercussions.

Id. at 531 n.21.  Thus, in at least one context, namely, crimes implicating the fourth Calder category, the high Court has condemned the reliance interest argument advanced by the Commonwealth − rejecting the notion that protection of an individual's reliance interests is the sole aim of the Ex Post Facto Clause − and suggested that such an argument would be equally unavailing in the context of the third Calder category at issue herein.

Additionally, the Commonwealth cites no case law which would support limiting the *ex post facto* prohibition to intentional crimes; to the contrary, other courts have found *ex post facto* violations in circumstances involving unintentional crimes.  See, e.g., Masino, supra (holding the date of the criminal negligence by contractors who failed to properly encase underground gas pipes in concrete, resulting in leakage and an accumulation of gas which caused an explosion that killed several people, not the date of the consequences of such negligence, was the relevant date of the unintentional crime for purposes of an *ex post facto* analysis); State v. Bunn, 440 P.2d 528 (Haw. 1968) (engaging in *ex post facto* analysis in case involving negligent homicide by vehicle).

Finally, as the United States Supreme Court noted in Carmell regarding the protection provided by the Ex Post Facto Clause:

> There is plainly a fundamental fairness interest, even apart
> from any claim of reliance or notice, in having the
> government abide by the rules of law it establishes to govern
> the circumstance under which it can deprive a person of his
> or her liberty or life.

529 U.S. at 533.

For all of the reasons discussed above, we conclude that, for purposes of an *ex post facto* inquiry, the Commonwealth's focus on the *result* of an individual's criminal acts − in this case, the death of the victim − is misplaced.  Rather, we hold that, where a

crime requires both a criminal act and a subsequent result (e.g., a homicide), the imposition of a more severe sentence based on a statute that was amended after the act was committed, but prior to the result of that act, violates the *ex post facto* prohibition.

This Court must adhere to the principles set forth in the United States Constitution, as interpreted by the high Court. As Rose's assault on the victim occurred in 1993, when the applicable statute provided for a maximum sentence of 20 years for third-degree murder, the trial court's imposition of a longer sentence − a maximum term of 40 years − under an amendment to the statute that occurred subsequent to the assault, violated Rose's rights under the Ex Post Facto Clause. Thus, the Superior Court properly vacated the trial court's sentence and remanded for resentencing.

Order affirmed.

Mr. Chief Justice Saylor and Messrs. Justice Eakin and Baer join the opinion.

Mr. Chief Justice Saylor files a concurring opinion.

Mr. Justice Eakin files a concurring opinion.

Mr. Justice Stevens files a dissenting opinion.