J-S17032-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :  IN THE SUPERIOR COURT OF
                              :        PENNSYLVANIA
                              :
               v.             :
                              :
                              :
JOSEPH FRANCESCO BENT         :
                              :
          Bent                :  No. 1189 MDA 2020

Appeal from the Judgment of Sentence Entered June 22, 2020
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0002499-2018

BEFORE:  STABILE, J., KUNSELMAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                    **FILED JUNE 22, 2021**

Joseph Francesco Bent (Bent) appeals *pro se* from the judgment of
sentence imposed by the Court of Common Pleas of York County (trial court)
after a jury convicted him of various sexual offenses.  After review, we affirm
Bent's convictions but vacate his sentence in part.

**I.**

This case arises from Bent's assault of E.L. on July 12, 2017.  On that
day, E.L was at Bent's home as a home health aide to his teenage son.  The
trial court summarized her trial testimony about what happened as follows:

> [Bent], who was employed as a property manager by his
> parents, was angry when he arrived home, due to a tenant's
> failure to pay a bill.  N.T. at 145.  Shortly after arriving home
> [Bent] offered [E.L.] a beer, which she accepted.  N.T. at 147.

---

[*] Retired Senior Judge assigned to the Superior Court.

When asked why she took the beer while on the job, she stated, "I can't even explain how stressed out I was. It was so hard. The nursing school, it was accelerated. It was hard work. I had a baby and I was working still. I was working part time. I had just come from school when I went to work that day. I don't know. My reasons wouldn't justify doing it, but I'd say that I was vulnerable to making a bad decision I guess if I thought it would relieve my stress." N.T. at 147-48. After accepting the beer, [Bent] told [E.L.] that he was going to smoke some marijuana in his bedroom and she could join him "or go outside." N.T. at 148. [E.L.] went with him into his bedroom, sat on his bed, and smoked marijuana. N.T. at 148-49. [S]he drank a single beer and did not know how much marijuana she smoked as it was not a regular habit with her, and that she felt impaired by the combination. N.T. at 149.

[E.L.] testified that after smoking the marijuana [Bent] chatted with her on the bed before moving very close to her. N.T. at 149-50. [E.L.] interpreted [Bent]'s movement as a sexual advance and testified that she told him no immediately. She testified that she said, "I told him no. I said this is not going to happen, we're not doing this. And he -- he didn't move away when I said no. He still had his hand on me. He still was right there. I told him no. He did not move away until I said that I had just gotten engaged." N.T. at 150. [Bent] then tried to make small talk about [E.L.]'s engagement and told [E.L.] that he wanted to be her "best friend." N.T. 150. Abruptly, while the two were still conversing and [E.L.] was telling [Bent] about her engagement to her child's father, [Bent] put his arm around [E.L.], put his mouth to her ear, and said, "I want to lick your pussy." N.T. at 151. [E.L.] testified that her response was to immediately jump up and get away from him. N.T. at 151.

She testified that she left the bedroom but that she felt too inebriated to drive away from [Bent]'s residence, despite her desire to do so after her interaction with [Bent] in his bedroom. N.T. at 152. [E.L.] testified that when she left the bedroom [Bent] followed her into the living room while she sat down on the couch and began crying. She testified that she began crying because "I thought I was going to lose my job. I thought I was going to ruin like everything that I was working for. For me to do something like that when I was working and call myself somebody who wants to be a nurse and to do something that would put me in this position, I felt so stupid. I felt so scared. I felt like I just made a

royally bad decision, you know?" N.T. at 152. [Bent] then sat down next to [E.L.] on the couch and asked her why she was crying. She expressed that she was afraid of losing her job. [Bent] then pulled out his cell phone and started to type a message and [E.L.] testified that [Bent] said, "so that's how it's going to be." N.T. at 153. [E.L.] interpreted [Bent]'s actions as an attempt to report her to her employer. N.T. at 153.

Sometime shortly after this interaction [E.L.] testified that [Bent] stood up from the couch and "he kind of guided me to my feet like by my arm," and brought her back into his bedroom. She testified that she was pushing him a little bit at this point. N.T. at 154.

After [Bent] led [E.L.] back into his bedroom, he attempted to undress her while she was standing near the door of his bedroom. N.T. at 154. [E.L.] testified that she was attempting to keep the buttons of her shirt together while he was unbuttoning them. N.T. at 155. [E.L.] also testified that [Bent] put his mouth on her neck, kissing her, while attempting to undress her. N.T. at 155. She was trying to get away from him while this was happening. N.T. at 155. [S]he was pressed up against a wall while this was happening. N.T. at 156. After failing to unbutton her shirt, [Bent] attempted to undo her pants and then put her on the bed. N.T. at 156. [E.L.] testified that she stated "no" repeatedly while all this was taking place. N.T. at 157. While she was laying on the bed [Bent] removed [E.L.]'s pants and underwear. N.T. at 157. [E.L.] testified that once her pants were off, [Bent] performed oral sex on her. [Bent] also put his finger inside her genitals. N.T. at 157-58.

After this first assault, [Bent] pulled down his pants and put his penis inside her vagina. N.T. at 158. When [E.L.] was asked if she said no at this point, she testified that she could not speak at that moment. She also testified that she was too scared to move. N.T. at 159. She said she felt paralyzed, but that she was trying to move. N.T. at 160. [Bent] was on top of [E.L.] at this point. N.T. at 160. While [E.L.] testified that she was not sure how long this went on for, at some point [Bent] stated, in [E.L.]'s words, "I'm not going to bust in you, I'm going to bust on you[.]" N.T. at 160. [E.L.] testified [Bent] ejaculated on her lower abdomen. N.T. at 160-161. [Bent] testified that she was not allowed to leave from the time [Bent] brought her back into his room to the time he finished assaulting her. N.T. at 161. When

asked if he prevented her from leaving, she stated, "Well, yes. He was in constant contact with my body. He was — my main focus was stopping the very — each little thing he was doing in the moment as far as removing clothes, trying to counter everything." N.T. at 161.

After [Bent] finished. [E.L.] was asked what she did after he left the room. She stated, "I started to move. It took me a little bit to get myself up, but I stood up and pulled my pants up, put my pants on." N.T. at 161. After putting her clothes back on, [E.L.] went to a bathroom across the hall and cleaned her stomach. N.T. at 161-62. After cleaning herself off, [E.L.] got into her car, left [Bent]'s residence, and went to York Hospital to report the rape. N.T. at 162-63.

Trial Court Opinion (TCO), 2/3/21, at 2-5.

At the hospital, E.L. underwent a sexual assault forensic examination. During the exam, E.L. was trembling, crying, wringing her hands and needed frequent breaks to gather herself. E.L. told the forensic nurse that Bent penetrated her vagina with his penis and finger and possibly her anus with his finger. She also told the nurse that she had not had consensual intercourse with anyone else in the five days before the assault.

The nurse examined E.L. but found no injuries. The nurse then examined her with an alternative light source to see whether there were any areas on her body that would fluoresce if exposed to light. This was done on her neck and abdomen based on her account of the assault. While her neck showed dried secretions, her abdomen showed nothing.

The forensic nurse next used a sexual assault evidence kit to collect the following: oral swab samples; fingernail samples; pubic hair combing samples; external genital swabs; vaginal and rectal swabs; and a buccal swab.

- 4 -

The nurse also collected swabs from her neck and her lower abdomen. The nurse then sealed the evidence for the police to submit for serology and DNA testing with the Pennsylvania State Police (PSP) to see if matched Bent, whose DNA was obtained through a search warrant.

PSP first performed serology testing. While the vaginal, rectal and oral samples were negative, the external genitalia sample was positive for seminal material. Likewise, while the lower abdomen sample was negative for seminal material, the neck sample was positive for saliva. PSP next performed DNA testing. Because the items possibly contained sperm (except the neck sample), PSP divided each sample into sperm and non-sperm fractions. Except for the vaginal and neck samples, three of the items matched Bent's DNA profile in some way. First, the sperm fraction of the rectal sample was consistent with a mixture of two individuals and had a major component match with Bent's profile. Second, the sperm fraction of the oral sample matched Bent's profile. Third, the sperm fraction for the external genitalia sample was consistent with a mixture of at least three individuals, with the major component matching Bent's profile. Finally, PSP conducted male chromosome testing on the samples and found that the vaginal swab's non-sperm fraction matched Bent's profile.

The Commonwealth charged Bent with rape by forcible compulsion, involuntary deviate sexual intercourse (IDSI), sexual assault, aggravated

indecent assault and indecent.[1]  At his jury trial, Bent represented himself and presented a defense in which he admitted that he had sexual contact with E.L. but claimed it was consensual.  The jury found him guilty of all counts.  At sentencing, the trial court imposed an aggregate term of 14½ to 29 years' imprisonment comprised of:  (1) 7 to 14 years for rape; (2) a consecutive 4½ to 9 years for IDSI; (3) a concurrent 4½ to 9 years for sexual assault; (4) a consecutive 3 to 6 years for aggravated indecent assault; and (5) a concurrent 9 to 18 months for indecent assault.  As part of its rape sentence, the trial court added three years' probation under 42 Pa.C.S. § 9718.5 which mandates a consecutive three years' probation for certain sexual offenses.

Bent filed a counseled post-sentence motion raising, among other issues, a weight of the evidence claim that was denied.[2]  Bent timely appealed. In his statement of errors complained of on appeal under Pa.R.A.P. 1925(b), he raised challenges to the sufficiency of evidence for rape and IDSI; the weight of the evidence; and the jurors not being given notepads.  He later amended the statement to also challenge his probation under Section 9718.5 because that statute became effective after his offenses.

---

[1] 18 Pa.C.S. § 3121(a)(1), 3123(a)(1), 3124.1, 3125(a)(1) and 3126(a)(1), respectively.

[2] The trial court granted Bent's request to merge his sexual assault conviction because its statutory elements were included in the IDSI.

Because Bent continued to file *pro se* filings, we directed the trial court to conduct a *Grazier* hearing.[3] After the hearing, the trial court allowed Bent to proceed *pro se* on appeal. Not long after, he filed a new Rule 1925(b) statement challenging, among other things, the racial composition of the jury pool. On appeal, Bent presents six issues for our review: (1) sufficiency of evidence for rape; (2) sufficiency of evidence for IDSI; (3) weight of the evidence; (4) jury pool composition; (5) notepads for jurors; and (6) probation under Section 9718.5. *See* Bent's Brief at 2.

## II.

## A.

We first address whether there was sufficient evidence to convict Bent of rape by forcible compulsion and IDSI by forcible compulsion.[4] A person

---

[3] *See Commonwealth v. Grazier*, 713 A.2d 81 (Pa. 1998) (requiring on-the-record inquiry determining whether waiver of counsel is knowing, intelligent and voluntary).

[4] Because a claim challenging the sufficiency of evidence is a question of law, our standard of review is *de novo* and our scope of review is plenary. *See Commonwealth v. Williams*, 176 A.3d 298, 305-06 (Pa. Super. 2017). Moreover,

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [this] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of

commits the offense of rape when he "engages in sexual intercourse with a complainant … [b]y forcible compulsion." 18 Pa.C.S. § 3121(a)(1). Besides its ordinary meaning, sexual intercourse includes "intercourse per os or per anus, with some penetration however slight; emission is not required." *Id*. § 3101. A person commits the offense of IDSI when he "engages in deviate sexual intercourse with a complainant … [b]y forcible compulsion." *Id*. § 3123(a)(1). Deviate sexual intercourse is defined as "[s]exual intercourse per os or per anus between human beings.... The term also includes penetration*, however slight,* of the genitals or anus of another person with a foreign object for any purpose other than good faith medical, hygienic or law enforcement procedures." *Id.* § 3101.

Forcible compulsion, meanwhile, is defined as "[c]ompulsion by use of physical, intellectual, moral, emotional or psychological force, either express

_____

innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Lopez*, 57 A.3d 74, 79 (Pa. Super. 2012) (citation omitted).

or implied." *Id*. § 3101.  A determination of forcible compulsion rests on the totality of the circumstances, including, but not limited to:

> the respective ages of the victim and the accused, the respective mental and physical conditions of the victim and the accused, the atmosphere and physical setting in which the incident was alleged to have taken place, the extent to which the accused may have been in a position of authority, domination or custodial control over the victim, and whether the victim was under duress.

*Commonwealth v. Gonzalez*, 109 A.3d 711, 721 (Pa. Super. 2015) (citation and emphasis omitted).  Moreover, the Commonwealth need not show that the victim resisted the assault to prove forcible compulsion.  *Id*.

We have little difficulty concluding that the Commonwealth presented sufficient evidence to prove that Bent used physical force to commit his actions.  E.L. described the first physical contact with Bent, testifying that "[h]e was trying to unbutton my shirt from the top and I was trying to keep the buttons back."  N.T. at 155.  When Bent tried to kiss her, E.L "was trying to get away from him."  *Id*.  Bent pressed E.L. up against the wall and tried to undo her shirt and pants even though she was trying to "keep the zipper up and the button buttoned."  *Id*. at 156.

> E.L. then tried to resist Bent after he put her onto the bed:
>
> I said no the entire time and every motion.  I kept saying no, no, no, no, no, no, no, no, no, no.  I kept saying no.  The whole time. And by the time I'm on the bed, there was a point where the voice stops working.  There was a point where you stop hearing it, you know.  You are mouthing it, you can feel your mouth trying to make the word, but it's not coming out.

*Id*. at 157.

As E.L. tried to move away, Bent pulled down her pants and tried "to give [her] oral sex" by putting his mouth on her vulva and penetrating her vagina with his finger. *Id*. at 157-58. Bent then stood up and pulled down his pants and put his penis in E.L.'s vagina. *Id*. at 158. When asked if she tried to get away when Bent was on top of her, E.L. replied:

> I was, but not in a way that maybe – my body could not move. I must have been – I was so scared I couldn't move. Like I couldn't – my body felt heavy.

> * * *

> I was just trying to lift my arms or something and like move my muscles. God, it was the worst feeling. It was like being paralyzed. I felt like I couldn't move and I couldn't get up, but in my heart I wanted to. I was trying. I was really trying.

*Id*. at 159-160.

Viewed in the light most favorable to the Commonwealth as the verdict winner, the jury credited E.L.'s version over Bent's and found that he used physical force to engage in sexual intercourse and deviate sexual intercourse. As E.L. testified, when Bent began to make sexual advances, she not only repeatedly told him no, but also physically resisted by trying to stop him from undoing her shirt and pants. Despite her efforts, he removed her clothes and got her onto the bed where he penetrated her vagina with his mouth, finger and penis. Putting aside the physical evidence corroborating that Bent engaged in sexual contact, E.L.'s testimony was enough to establish that Bent engaged in sexual intercourse and deviate sexual intercourse by forcible compulsion.

- 10 -

**B.**

We next address Bent's weight of the evidence claim.[5]  Though his issue lists only his indecent assault conviction, he directs his argument to all offenses, raising various theories for why the greater weight of the evidence favored his version over that given by E.L.  We address these theories as much as we can discern them from his brief.

First, at various points in his brief, Bent asserts that E.L.'s version of what happened did not match the result of the sexual assault forensic examination or the serology and DNA testing.  In particular, he points out that

---

[5] Our standard for weight of evidence claims is as follows:

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court.  A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion.  Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court.  Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.  In order for an appellant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court.

***Commonwealth v. Mbewe***, 203 A.3d 983, 988–89 (Pa. Super. 2019) (citations and quotation marks omitted).

E.L. testified that he ejaculated on her abdomen but no seminal material was found at that spot in either the light source examination or the serology testing. At trial, however, E.L. testified that she "cleaned off" her stomach with toilet paper just after the assault. N.T. at 161. Apparently anticipating Bent's argument, the Commonwealth asked its witnesses about what effect a person's wiping or cleaning would have on the collection of evidence. The forensic nurse testified that the exam does not always reflect everything that is on a person's skin, especially if the patient cleansed the area or wiped off any material. *Id*. at 231-32. Similarly, the serology forensic scientist related that wiping would decrease the ability to capture the evidence. *Id*. at 295. Finally, the Commonwealth's DNA expert also testified that it was possible for DNA to be "completely wiped off" and that an absorbent material like toilet paper was more likely to pick up more DNA material. *Id*. at 319, 330. Based on this evidence, the jury could infer that E.L. removed the seminal material when she wiped it off. As a result, we cannot agree with Bent's seeming belief that the lack of any such material on her abdomen rendered her testimony incredible.

Bent also highlights that the DNA testing on the external genitalia sample revealed DNA from a third individual, even though E.L. told the forensic nurse she did not have consensual sex with anyone in the five days prior to the assault. Bent faults the Commonwealth for not obtaining a DNA sample from her boyfriend at the time to confirm if he was the third individual.

We find this argument unconvincing. At trial, Bent did not dispute that he had sexual contact with E.L. As a result, the presence of his DNA on E.L. was not a matter in dispute. Instead, the dispute centered on whether that contact was consensual or accomplished with forcible compulsion; the presence of a third individual's DNA on E.L. had little to no import to his defense aside from possibly contradicting the information that E.L. provided to the forensic nurse. Even if that were the case, it would not be a fact of greater weight requiring a new trial.

Next, Bent asserts throughout his brief that E.L.'s testimony was incredible and should not have been believed by the jury. He sets forth various reasons for this assertion, pointing out perceived inconsistences as well as her consumption of beer, marijuana and medication. We find that the trial court's response to these arguments sufficiently explains why his claim is meritless:

> [Bent's] argument fails because [E.L.] testified with great detail and confidence regarding the course of events that occurred that day and [E.L.] testified to having only one beer and a small amount of marijuana and that she hadn't taken her medicine since the morning of that day while the assault took place sometime after 3:00 p.m. Furthermore, while the victim did state that she was too inebriated to drive, the jury could easily infer that was merely an act of caution and good judgement rather than an indication that she was too impaired to accurately remember being raped and assaulted. If anything, the fact she accurately assessed her risk on the road demonstrates her competence during the relevant time period. [Bent] also failed to present any evidence that the ingestion of a small amount of marijuana, a single beer, and some medicine taken hours earlier would have created enough of an impairment to overcome the presumption of [E.L.'s] competence to testify. The jury was presented with the facts of [E.L.'s] mental state at the time. The jury chose to believe her testimony was accurate. The weight of [her] testimony was

- 13 -

not lessened by the fact that she may not have been in a crystal clear frame of mind while being raped, however the trauma of the event alone explains any small defect she may have had in recalling the events of that day. [Bent's] unsubstantiated claim [E.L.] was too impaired to "accurately recall the alleged incident" is not a fact that outweighs or negates the victim's testimony.

Trial Court Opinion (TCO), 2/3/21, 26-27 (internal record citations and footnote omitted).

Finally, Bent asserts the police did not perform a sufficient investigation because they did not go to his house to collect evidence after learning about the assault. At trial, the lead detective conceded that going to the home could have been beneficial, particularly to recover the toilet paper that E.L. discarded after the assault. N.T. at 259. However, the detective explained that it had been several days after the assault when he learned about the toilet paper. Based on his experience that evidence can be destroyed, he decided not to obtain a search warrant for the home. *Id*. Bent was free to argue that this lack of investigation supported his version, and the jury was free to accept it as an adequate explanation for why the police decided not to search his home. Either way, this is not a fact of greater weight rendering the jury's verdict as being against the weight of the evidence. We find that the trial court properly denied the weight of the evidence claim.

## C.

We likewise conclude that Bent's jury pool claim lacks merit. Before jury selection, Bent, who is African-American, objected to the jury pool because "statistically" he would face an all-white jury. N.T. at 9. The trial court

deferred ruling on the objection until after selection. *Id*. at 10. He renewed the objection at the conclusion of jury selection. *Id*. at 106. There being no evidence that the jury was not drawn from a representative cross-section of the community, the trial court denied his objection. *Id*. at 113-14.

Bent argues that the selected jury pool violated his constitutional right to an impartial jury. For such a challenge, our Supreme Court has explained:

> "Defendants are not entitled to a jury of any particular composition, but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." ***Taylor v. Louisiana***, 419 U.S. 522, 538, 95 S.Ct. 692, 701, 42 L.Ed.2d 690, 703 (1975) (citations omitted; emphasis added).
>
> In order to establish a prima facie violation of the requirement that the jury array fairly represent the community, a defendant must show that: (1) the group allegedly excluded is a distinctive group in the community; (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such people in the community; and (3) this underrepresentation is due to systematic exclusion of the group in the jury selection process. ***Duren v. Missouri***, 439 U.S. at 364, 99 S.Ct. at 668, 58 L.Ed.2d at 586–87. "Systematic" means caused by or inherent in the system by which juries were selected. *Id.* at 366–67, 99 S.Ct. at 669–70, 58 L.Ed.2d at 588.

***Commonwealth v. Craver***, 688 A.2d 691, 696 (Pa. 1997) (emphasis omitted). Moreover,

> [p]roof is required of an actual discriminatory practice in the jury selection process, not merely under-representation of one particular group. The defendant bears the initial burden of presenting *prima facie* evidence of discrimination in the jury selection process.

***Commonwealth v. Johnson***, 838 A.2d 663, 682 (Pa. 2003).

- 15 -

As the trial court recognized, Bent offered no evidence to support his contention that the jury pool underrepresented a particular race or systematically excluded. He does the same here, asserting again a generalized complaint without evidence that the jury pool did not represent a true cross-section of the community. *See* Bent's Brief at 13. As stated above, proof of an actual discriminatory practice in the jury selection process is required; it is not sufficient to merely allege that a certain group is underrepresented, which is what Bent did in the trial court. Having failed to sustain his initial burden, we find no merit to his jury pool challenge.

**D.**

Next, Bent claims that the trial court erred in not giving the jurors notepads to take notes during his three-day jury trial. Pennsylvania Rule of Criminal Procedure 644, which governs the taking of notes by jurors, provides that, "[w]hen a jury trial is expected to last for more than two days, jurors shall be permitted to take notes during the trial for their use during deliberations. When the trial is expected to last two days or less, the judge may permit the jurors to take notes." Pa.R.Crim.P. 644(A).

First, as both the trial court and Commonwealth observe, Bent never raised a contemporaneous objection on this claim at trial. As a result, his claim is waived. *See* Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal."). In any event, as the Commonwealth notes, although his trial was three days long, those

three days include *voir dire* and counsels' statements. As a result, the testimony from the witnesses lasted less than two days. **See** Commonwealth Brief at 24. Moreover, Bent fails to develop an argument explaining how he was prejudiced by the jurors not being given notepads. His claim, therefore, lacks merit.

**E.**

In the last issue, Bent challenges the trial court's imposition of a consecutive three years' probation to its sentence for rape under Section 9718.5 of the Sentencing Code. That section provides:

> **(a) Mandatory probation supervision after release from confinement.--**A person who is convicted in a court of this Commonwealth of an offense under section 9799.14(d) (relating to sexual offenses and tier system) shall be sentenced to a mandatory period of probation of three years consecutive to and in addition to any other lawful sentence issued by the court.

42 Pa.C.S. § 9718.5(a)-(b).

The Commonwealth concedes that the trial court's sentence is illegal because Section 9718.5 did not become effective until April 23, 2018. Bent's offenses, however, were committed several months before that - in July 2017. **See** Commonwealth Brief at 24-26. The trial court likewise acknowledges that it erred and requests that we grant relief to Bent. **See** TCO at 29.

After review, we agree that imposition of the three-year probationary sentence under Section 9718.5 constituted an *ex post facto* violation. As our Supreme Court summarized:

> In order for a criminal or penal law to be deemed an *ex post facto* law, two critical elements must be met: it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it.

***Commonwealth v. Rose***, 127 A.3d 794, 799 (Pa. 2015) (citation omitted).

Here, Bent committed his offenses in July 2017, and the statute was not effective until April 2018. Consequently, the statute's application to him was retrospective. The sentence also disadvantaged him because it imposed additional years of probation beyond his term of imprisonment. We find that the sentence constituted an illegal *ex post facto* violation.

Accordingly, we vacate the provision of his sentence for rape (count one) imposing a consecutive three-year period of probation. In all other respects, we affirm Bent's convictions and judgment of sentence.[6]

Convictions affirmed. Judgment of sentence vacated in part. Jurisdiction relinquished.

Judgment Entered.

_Joseph D. Seletyn_
Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/22/2021

---

[6] Because our ruling does not disturb the trial court's sentencing scheme, we need not remand for resentencing. ***See Commonwealth v. Thur***, 906 A.2d 552, 570 (Pa. Super. 2006).